ROBERT SIKO (SBN 312856)
rsiko@andrewshiggins.com
**ANDREWS & HIGGINS**
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Telephone: (949) 748-1000
Facsimile: (949) 315-3540

PAIGE BOLDT (SBN 308772)
pboldt@anapolweiss.com
D. PATRICK HUYETT*
phuyett@anapolweiss.com
**ANAPOL WEISS**
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 608-9645
Facsimile: (215) 735-2211

ALEXANDRA M. WALSH*
awalsh@anapolweiss.com
**ANAPOL WEISS**
14 Ridge Square, NW, 3rd Floor
Washington, DC 20016
Telephone: (771) 224-8065
Facsimile: (215) 735-2211

*Attorneys for Plaintiff*

*\*Pro Hac Vice* motions forthcoming

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JANE DOE,

        Plaintiff,

v.

ROBLOX CORPORATION; DISCORD INC.; and UBER TECHNOLOGIES, INC.,

        Defendants.

Case No.: 3:26-cv-03513

**COMPLAINT FOR DAMAGES**

(1) Fraudulent Concealment
(2) Negligence – General
(3) Negligence – Failure to Warn
(4) Negligence – Unreasonable Design
(5) Negligent Undertaking
(6) Strict Liability – Design Defect
(7) Strict Liability – Failure to Warn
(8) 18 U.S.C. § 1595
(9) Negligence

**JURY TRIAL DEMANDED**

COMPLAINT

Plaintiff Jane Doe ("Plaintiff") brings this action against Defendants Roblox Corporation ("Roblox"), Discord Inc. ("Discord"), and Uber Technologies, Inc. ("Uber") (collectively, "Defendants") to recover damages arising from the severe injuries that she suffered because of Defendants' respective conduct in creating, designing, marketing, and distributing their mobile- and web-based applications ("apps"), and alleges as follows:

## I. <u>INTRODUCTION</u>

1. This action seeks to hold Defendants Roblox, Discord, and Uber accountable for facilitating the sexual exploitation and abuse of Plaintiff, who was 15 years old at the time of the abuse and is now barely an adult. The unimaginable injuries Plaintiff suffered were possible only because of the egregiously tortious conduct of Defendants. The heinous acts against Plaintiff were committed by a dangerous child predator whose predatory conduct had been widely documented, publicly reported on, and even reported directly to both Roblox and Discord long before the predator's abuse of Plaintiff. Yet this predator was still able to access and roam freely on Roblox and Discord, where he groomed and sexually exploited Plaintiff, and then used an Uber driver to transport her from Indiana to his home in New Jersey, where he raped her over several days.

2. Months before Plaintiff was kidnapped and raped, Roblox's and Discord's own users sounded the alarm about the child predator, a notorious adult Roblox developer with the username DoctorRofatnik. Dozens of screenshots of his predatory and exploitative contact with minor girls were plastered all over the internet, including him telling one 12-year-old, "You're the reason why I'm gonna end up behind bars" and "You're 12…soon I'll corrupt you beyond your wildest dreams." DoctorRofatnik even admitted, publicly, that he had sent those messages. A major international newspaper—*The Guardian*—wrote an exposé of his predatory behavior on Roblox and Discord. Roblox's own community members even managed to identify DoctorRofatnik's real name and address, using sources publicly available on the internet. And yet, despite clear notice about the dangers that DoctorRofatnik posed to the Roblox and Discord communities, he was still able to access both platforms and continue preying on minors, including Plaintiff.

3. Using both Roblox and Discord, DoctorRofatnik groomed Plaintiff by earning her trust and friendship. He was able to convince Plaintiff that the allegations against him were false

because he was still active on both platforms. He played games on Roblox with her, chatted with her on Discord, and sent gifts via Amazon and food delivery via Doordash to her home in Indiana. Using his clout and position of authority as the developer of a popular game on Roblox, DoctorRofatnik even commissioned artwork from Plaintiff, continuing to groom and ingratiate himself to her. DoctorRofatnik's following on Roblox and on Discord added additional weight to his grooming attempts: an entire group of people promoted and defended this predator, in large part due to the power and notoriety he wielded through his status on Roblox.

4.      In May 2022, Plaintiff was discovered missing from her home in Indiana. Eight days later, she was found in a tiny, cramped room rented by DoctorRofatnik, who had paid an Uber driver $1,000 to kidnap her and bring her to his home in New Jersey. DoctorRofatnik's real name was discovered by law enforcement to be Arnold Castillo, which Roblox's own users had known for months. Castillo had raped Plaintiff repeatedly during the time she was missing.

5.      Castillo's sexual abuse of Plaintiff was the direct result of Defendants' conduct. Roblox and Discord failed to conduct adequate investigations into Castillo's grooming and sexual exploitation of underage minors on both platforms, despite actual and constructive notice of such abuse long before Plaintiff was abused. Roblox and Discord unreasonably delayed taking action, ignored public and internal signals that readily identified "DoctorRofatnik" as Castillo, and allowed him to evade bans, remake accounts, and transfer ownership of his games to other affiliated users. Roblox also failed to suspend payouts for Castillo's game, and both companies failed to flag the implicated group, or notify users who had interacted with him. Both companies also failed to provide the National Center for Missing and Exploited Children with information about Castillo's accounts and other information that they readily had access to, which delayed law enforcement's identification of Castillo. The failure by Roblox was particularly egregious because Castillo was registered on the platform's "DevEx" (or Developer's Exchange) program—registration that required both a real name and a bank account which Roblox could have easily used to identify the person or persons behind the account. Even after confirming Castillo's predatory conduct, Roblox continued to pay his associates based on transactions from his games—payments Roblox knew were still reaching Castillo, and which he used to facilitate and commit his crimes against Plaintiff.

6.      Castillo was also able to physically access Plaintiff only because of Uber. Using the Uber app, Castillo was able to find an Uber driver, communicate with that driver his desire to arrange an off-platform ride, and then arrange for Plaintiff—a 15-year-old girl at the time—to be transported all the way from Indiana to New Jersey. Uber's failure to supervise and train its drivers on the risks of off-app transportation of minors, and its failure to report suspicious communications to law enforcement, directly enabled Castillo's successful abduction and trafficking of Plaintiff.

7.      Plaintiff has suffered unimaginable harm. Her innocence has been snatched from her forever. The effects of child sex abuse stay with a child long after she becomes an adult and interfere with even basic life functions, not to mention school and work. As Plaintiff's sister said in Castillo's criminal sentencing hearing, "These scars will remain with her forever." Tragically, what happened to her is far from an isolated event. Indeed, Plaintiff is just one of countless children whose lives have been devastated as a result of Defendants' refusal to take child safety seriously. This action, therefore, is not just a battle to vindicate Plaintiff's rights; it is a stand against Defendants' systemic failures to protect society's most vulnerable from unthinkable harm in pursuit of financial gain over child safety. As the judge in Castillo's criminal case said when sentencing him to 15 years, "We protect kids because they can't protect themselves."

## II.    PARTIES

### A.    Plaintiff

8.      Plaintiff Jane Doe is a citizen and resident of the State of Indiana, with a principal place of residence in Marion County.

9.      Plaintiff has suffered profound and enduring harm. This includes significant emotional distress, psychological trauma, and mental anguish. Plaintiff's experiences have led to a loss of trust, safety, and personal security, depriving her of the opportunity for a normal and healthy development. The injuries she sustained are severe, ongoing, and permanent, affecting her daily life and emotional health in lasting and immeasurable ways.

10.     Plaintiff never entered any contract with Defendants. To the extent Defendants claim that Plaintiff attempted to accept an electronic terms and conditions clause by clicking buttons on a screen that included language that Plaintiff did not read or understand, such an

assertion is legally erroneous, invalid, and unenforceable, including because Plaintiff disaffirms any contract that she may have entered as a minor, including any forced arbitration agreement and any delegation clause in any contract; Plaintiff lacked the capacity to enter any contract, including any forced arbitration agreement and any delegation clause in any contract; and any arbitration agreement is invalid and unenforceable under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, Pub. L. No. 117–90, codified at 9 U.S.C. §§ 401-402. Furthermore, Plaintiff disaffirmed any contract she may have entered with Roblox prior to gaining majority.

**B.    Defendants**

11.    Defendant Roblox Corporation is a Nevada corporation with its principal place of business in San Mateo, California. Roblox owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the Roblox app. Roblox is widely available to consumers throughout the United States.

12.    Defendant Discord Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Discord owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the Discord app. Discord is widely available to consumers throughout the United States.

13.    Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Uber owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the Uber app. Uber is widely available to consumers throughout the United States.

**III.    JURISDICTION AND VENUE**

14.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, *i.e.*, 18 U.S.C. § 1595. This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as Plaintiff's federal claim. In addition, this Court has subject-matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendants because they maintain their principal places of business within this District.

16. Venue is proper here under 28 U.S.C. § 1391(b) because (1) all Defendants reside in this District and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Roblox Offers a Gaming App for Children.

17. Launched in 2006, Roblox is an online gaming app that allows users to play myriad games, which the company refers to as "experiences." There are currently more than 40 million experiences within the Roblox ecosystem.

18. Roblox is easily accessible, including to minors. It is free to download and play and is available on gaming consoles, computers, tablets, and cellular devices.

19. Roblox is designed to be an interactive experience, allowing and encouraging users to communicate with each other. Gameplay interactions, user hubs, direct messaging, and voice chat all promote social interactions between users. Roblox's co-founder and CEO David Baszucki has explained that his vision is for Roblox to bring about "the next phase of human interaction," which he also has described as "a new category of human coexperience."[1] Roblox has similarly explained that it "operates a human co-experience platform . . . where users interact with each other to explore and develop immersive, user-generated, 3D experiences."[2]

20. Roblox designed its app for children. Roblox has marketed its app not only as the "#1 gaming site for kids and teens"[3] but also as an educational experience for young users. Roblox claims that it provides "new gateways into learning"—from "chemistry to physics to robotics and more, Roblox experiences bring concepts to life in ways that immerse learners and motivate

---

[1] David Baszucki, Co-founder and CEO of Roblox, *The CEO of Roblox on Scaling Community-Sourced Innovation*, Har. Bus. Rev., The Magazine, (Mar-Apr 2022), https://hbr.org/2022/03/the-ceo-of-roblox-on-scaling-community-sourced-innovation.
[2] Roblox Corp., Quarterly Report (Form 10-Q) (Mar. 13, 2021).
[3] Roblox, *What Is Roblox*, http://web.archive.org/web/20170227121323/https://www.roblox.com/ (archived Feb. 27, 2017).

exploration, play, and deep thinking."[4] These offerings, according to Roblox, include "high-quality, standards-aligned, immersive educational experiences designed by curriculum experts."[5]

*Roblox webpage – "A New Era of Engaged Learning"*

21. Roblox's popularity among children exploded during the pandemic when the app was flooded with millions of new users as kids were confined to their homes and glued to their devices. By September 2020, roughly 30 million people, more than half of them under 13, were on Roblox daily, making it the world's biggest recreational zone for kids.

22. That growth has continued unabated. In Roblox's 2024 Annual Report, the company reported an average of 82.9 million daily active users, with 20% under 9 years of age; 20% from 9-12 years of age; 16% from 13-16 years of age; and 41% over 17 years of age.[6]

23. Roblox is the most downloaded online game globally, and the average user spends 139 minutes a day on the app.[7]

---

[4] Roblox, *A New Era of Engaged Learning*, https://corp.roblox.com/education (last visited Feb. 11, 2025).
[5] *Id.*
[6] 2024 Annual Report, Roblox, https://s27.q4cdn.com/984876518/files/doc_financials/2024/ar/Roblox-2025-Proxy_2024-AR-1-1.pdf.
[7] Qustodio, *Research by App Category – Gaming*, https://www.qustodio.com/en/the-digital-dilemma/gaming/ (last visited Mar. 2, 2026).

24.    Individuals who wish to play Roblox must create an account. It is extremely easy to "SIGN UP AND START HAVING FUN!" Users must provide only a birthdate, username, and password. For years, users of any age could create an account. In late 2024, Roblox began blocking new accounts that listed a birthdate indicating an age of five or younger. But because Roblox does not require age verification at sign-up, users can still misrepresent their age—claiming to be either older or younger than they really are. Roblox does not require an email address or phone number to make an account.



*Roblox Sign-up Screen*

25.    Although Roblox states that children must have parental permission before signing up for an account, nothing prevents them from creating their own accounts and playing on Roblox. Roblox does nothing to confirm or document that parental permission has been given, no matter how young a child is. Nor does Roblox require a parent to confirm the age given when a child signs up to use Roblox.

26.    After creating an account, all users are assigned a default player avatar—a blocky, Lego-esque cartoon character that represents the individual user within certain games.



*Example default avatar on Roblox.*

27.    Users can then play in millions of experiences on the app. These games are sorted into different genres/categories, such as Sports, Role-Playing Games, Fighting, First Person Shooters, Fashion, Horror, Comedy, Military, and Naval. The games recommended to a user will vary based on the age the user entered when generating their account and Roblox's algorithm that recommends games to the user.



*Examples of games available on Roblox.*

**B.    Roblox Relies on "Independent" Third-Party Developers to Create Games.**

28.    Unlike other online gaming companies, like Activision Blizzard or Epic Games, Roblox's games are not all developed in-house. Instead, third-party developers create many of the games on Roblox, using Roblox's proprietary developer studio, called Roblox Studio.

29.    Roblox Studio is a free, downloadable software program provided by Roblox. Roblox Studio lets game creators develop their own games by building 3-D worlds and then scripting how users will interact with each other, using Lua, a programming language.

30.     The basic building blocks used to create games in Roblox Studio are assets and packages. Assets are any elemental component of a game, such as a game character, a building within the game world, a sound, or a script for how an avatar will interact with the virtual world. Packages are groups of assets. Both assets and packages can be reused in other games, as long as their creator grants permission for them to be available in the Roblox Creator Store (formerly called the Library). In the Roblox Creator Store, game developers can either download for free or pay for game components, such as pre-made 3D objects, like buildings or furniture, or pre-made worlds. Developers can also access sound effects, music tracks, plug-ins that extend Roblox Studio's capabilities, textures that they can apply to buildings, and characters and fonts in the Creator Store.

31.     Although third-party developers make games, Roblox directly regulates some game parameters. For example, leaked internal Roblox documents show that Roblox made decisions about "[h]ow big of a 'bulge'" was acceptable, and, with the introduction of layered clothing for avatars (*i.e.*, allowing avatars to wear multiple layers of clothing), whether players could be nude.[8]

32.     Roblox also exercises substantial control over the design and creation of Roblox experiences through its intense in-person programs or workshops for intermediate to expert level developers. These programs are specifically designed to engage, supervise, direct, and train developers and designers to build more experiences for the Roblox platform. They specifically target "experienced developers who have demonstrated proficiency and have a deep understanding of Roblox's systems and game development process."[9]

33.     Roblox's Accelerator Program, officially in operation from 2015 to 2022, was a 12-week, on-site training for intermediate to expert level developers and creators, who were paid up to $13,000 by Roblox. This program trained anywhere between 40 to 50 participants a year under the direct supervision and direction of Roblox engineers for the sole purpose of creating, developing,

---

[8] Joseph Cox & Emanuel Malberg, *Leaked Documents Reveal How Roblox Handles Grooming and Mass Shooting Simulators*, Vice (Aug. 1, 2022), https://www.vice.com/en/article/leaked-documents-how-roblox-moderates-content-mass-shootings-grooming/.

[9] *2019 Accelerator/Incubator Spring Application*, Roblox Creator Hub (Jun. 2018), https://devforum.roblox.com/t/2019-accelerator-incubator-spring-application/137644.

and designing experiences.

34.    The Accelerator Program was full-time, and participants were expected to attend meetings between 10:00 a.m. and 6:00 p.m., Monday through Friday. Before COVID-19, the meetings were held at the Roblox headquarters in San Mateo, California. After COVID-19, the Accelerator Program moved to remote attendance.

35.    The Roblox Incubator program was similar to the Accelerator Program but targeted more advanced developers and projects that "affect the platform in a fundamental way that provides an improved developing ground for all Roblox developers."[10] In the Incubator program, participants would be given tasks or specific game creations to build under the direction and guidance of Roblox.

36.    The difference between the Accelerator program and the Incubator program is that the Incubator program looks to build or advance the overall Roblox platform, while the Accelerator program is focused on a particular experience. Under both programs, Roblox experiences, features, systems, data, and designs are created under the guidance, supervision, and control of Roblox. Some of the most popular experiences were created and designed through these programs.

37.    Both programs function as a "revolving door" through which developers and creators work under the training, direction, and supervision of Roblox. Through these programs, Roblox is the collaborator or investor, providing creative input and financial and structural support to developers and creators, who, in turn, funnel enormous engagement and revenue back to Roblox.

38.    The Roblox Accelerator Program was discontinued on November 7, 2022, and was replaced by other similar programs such as Roblox Game Fund, which provided funding to participants of the programs up to $500,000 per project and gave Roblox control over the design and creation of the experiences and features. The Roblox Game Fund ran from approximately 2021 until 2023, when it was replaced with the Creator Fund.

39.    Roblox's own employees also act as supposedly "independent" third-party developers and creators, further highlighting the incestuous relationship between Roblox developers and Roblox. For example, the owner of Fullflower Studio LLC, founded in 2020 by Anne

---

[10] *Id.*

Shoemaker and Luke Weber, participated in the Roblox Accelerator three times before founding the company. Weber, better known as "stickmasterluke," is both a Roblox developer and a paid Roblox employee. The couple incorporated Fullflower Studio shortly after Roblox insiders sold-off shares ahead of the company's 2021 public listing. Shoemaker has said she "came into some money" in 2020 that allowed her to staff up the studio. While the company's success appears legitimate, the timeline and insider access raise questions—including how a Roblox employee, like Weber, could profit personally from game development while still employed by Roblox, simultaneously benefiting from an Accelerator program in which his fiancée Shoemaker participated.

40.     Weber has enjoyed a long successful relationship with Roblox. As early as 2011, Venture Beat featured Weber as a young up-and-coming developer, and by 2019 some reports placed Weber as the second-richest holder of Robux—the digital currency on Roblox—behind only Roblox Corporation itself. Weber's most popular experience is Natural Disaster Survivor, which was created on or about March 8, 2008, prior to Weber becoming a Roblox employee and prior to founding Full Flower Studio. Since 2008, Natural Disaster Survival has registered over 3.8 billion visitors. While Weber is still an employee of Roblox, Weber has continued to update the Natural Disaster Survival experience, with the last updated date shown as September 24, 2025. Indeed, many of Roblox's most popular and unsafe experiences are created by current Roblox employees or parties related to Roblox, such that Roblox exercises substantial control over, and is responsible for, both the tools used to create an experience and the content of an experience itself.

41.     Roblox also uses other programs such as Developer Exchange and Creator Rewards to exercise control over the creation of experiences.

42.     Roblox also allows game developers to insert opportunities for monetization into the games. A "pass" is a one-time purchase players make to unlock special features, abilities, or content in a specific game. Users purchase these upgrades with Robux. Developers can also insert "developer products" into their games, which are items or abilities that users can purchase more than once, such as a specific game's virtual currency, or any other feature that is not permanent. Users also use Robux to pay for these enhancements.

43.     In addition to spending Robux within games, users can also spend Robux within

Roblox's Creator Store, where players can buy avatar items, like clothing or accessories, from other users.

44.    Children frequently become obsessed with purchasing or otherwise obtaining Robux to buy items for their avatars and to spend on their favorite experiences on Roblox. In Roblox's Creator Store, for example, the company sells rare items at astronomical prices, such as a type of hair for an avatar, which children seek to purchase to keep up with or outdo their peers on Roblox. As a result, children often tell others, including strangers, that they will do "Anything for Robux."[11]

45.    Roblox makes the majority of its money through Robux. Robux can be purchased in a single transaction or a user may subscribe to receive Robux on a recurring basis with a Roblox Premium membership. Roblox also offers Robux gift cards that anyone can purchase and send to any user. When a user spends Robux, the developer of the game or the item keeps a percentage of the fee, with Roblox keeping the rest. Roblox pays developers only about 28% of the Robux spent on their creations, with Roblox keeping the balance.[12] Developers can also earn Robux based on the share of time that subscription users spend in their game. These Robux can be converted into fiat currency, but only when a developer has accumulated enough Robux to meet a minimum threshold. This means that many developers cannot access their earnings in real life.

46.    Despite hosting tens of millions of games, only a small fraction of those games is responsible for the vast majority of Roblox's earnings. For example, in 2021, only 1,000 games generated more than $30,000 in developer earnings.[13] Indeed, user engagement is concentrated in the top few hundred games, with the top game garnering about 10% of user engagement, the top 10 games garnering approximately 30% of user engagement, and the top 200 games garnering approximately 60% of all user hours.[14]

---

[11] Olivia Carville & Cecilia D'Anastosio, *Roblox's Pedophile Problem*, Bloomberg Businessweek (July 23, 2024), https://www.bloomberg.com/features/2024-roblox-pedophile-problem/.
[12] Earn on Roblox, Roblox, https://create.roblox.com/docs/production/earn-on-roblox (last accessed Sep. 27, 2025).
[13] Simon Parkin, *The Trouble With Roblox, the Video Game Empire Built on Child Labour*, The Guardian (Jan. 9, 2022), https://www.theguardian.com/games/2022/jan/09/the-trouble-with-roblox-the-video-game-empire-built-on-child-labour.
[14] 2024 Annual Report, *supra* note 6.

47.     Thus, while Roblox boasts that it paid out $280.6 million to developers in the fourth quarter of 2024 and that it has 17,000 developers who were able to cash-out on their earnings in 2024, payments are concentrated among a much smaller number of developers.

48.     Because Roblox is dependent on Robux sales for its revenue, its business model hinges on attracting top developers. Popular games increase daily active users and the number of hours they spend on the platform. As Roblox boasts on its website, it supplies developers with "[e]verything you need to create, scale and monetize" and "is constantly investing in new tools and services to empower our creator community."[15] According to Roblox, "we exist to serve our community" of developers and are "always searching for new ways to increase creators' earnings." Roblox also promotes its top developers in numerous ways, including by featuring them on its website.

49.     The average Roblox developer is an adult. To be successful, developers need teams working for them on creating, updating, and innovating games for the platform. For that help, these developers often turn to those most familiar with the platform—tech-savvy kids—and hire them as employees or independent contractors. These kids are essential to a game's success, working on critical tasks such as animation, sound, design, 3D modelling, and programming. And, given their naivety and Roblox's lack of standards or protections, developers can get away with paying them little or nothing at all.[16]

50.     These children work in an environment that is perfect for sexual exploitation. The adult developers wield enormous power over these children, many of whom are introverted or otherwise struggle socially in the nonvirtual world. The developers pay these kids, teach them new skills, and provide them with an elevated status on the world's most popular gaming platform for kids. Even for victims who do not directly work for developers, developers' notoriety, influence, and power over other users of the platform substantially increase the opportunity for abuse.

---

[15] Creator Hub, Roblox, https://create.roblox.com/creator.
[16] Sam Biddle, *The Brain-Rotting Dystopia of Roblox*, New York (Sep. 9, 2025), https://nymag.com/intelligencer/article/what-is-roblox-video-game-app-metaverse-safe-children-ban.html.

51.    As the author of a *Bloomberg Businessweek* article on Roblox's pedophile problem emphasized, "Roblox developers are, like, modern-day God kings on digital platforms"—and their worshippers are their child employees and the users of their games. In addition to status within the larger community, development teams frequently take on a social hierarchy of their own, with young, impressionable children facing social and financial pressures to say or do whatever is necessary in order to maintain their social status and source of earnings. Child predators on Roblox are aware of this dynamic and have regularly used it to coerce sexual interactions.

**C.    Together, Roblox and Discord Make Up the Game Development Ecosystem.**

52.    Roblox Studio enables real-time, multi-user collaboration on a single game. A game may be owned by an individual account or by a "group," and owners can assign granular permissions that allow other users to edit, test, and publish updates, or manage the community. This structure lets large teams iterate quickly, invite outside contributors (including minors) into private workspaces, and spin up companion moderation teams for live games.

53.    In practice, most Roblox development teams adopt Discord as their primary workspace because it is faster and more flexible than Roblox's native messaging. Teams create servers organized into role-based channels for scripting, building, art, QA/bug reports, release announcements, and staff applications, alongside "off-topic" social chats. Discord further facilitates coordination outside of Roblox through features such as voice and video calls, screen sharing and live streaming of desktops, direct file and image/video uploads, private direct messages, group direct messages, invite links that can be posted publicly, and automation via bots and webhooks (for tasks like role assignment, ticketing, or logging). These features make it easy to move conversations—and children—off Roblox and into private spaces where images, videos, and voice communications flow with little friction.

54.    Creating an account on Discord is extremely easy. Users must provide only an email address, display name, username, password, and birthdate. No identity document is required and accounts are free. Users can then access Discord for free on their computers, tablets, and cellular devices.



*Discord Sign-up Screen*

55.    While Discord's Terms of Service prohibit users under 13, Discord does not verify age or identity. As a result, countless Discord users are under 13, many of whom state their real age in their bios, tell other users their real age in chats, and post pictures showing their real age. There are children as young as eight years old using Discord.[17]

56.    Although Discord offers certain safety features, Discord does not default to the highest safety settings upon account creation. For example, by default, all users, including those under 18, can receive direct messages from another user in the same server, allowing them to send and receive private messages from strangers. And even when parents set more restrictive settings, children can simply change those settings to whatever they desire.

57.    Certain content on Discord is "age-restricted," meaning in theory that children under 18 cannot access it. Server owners can self-designate specific channels in a server as age-restricted. For years, however, Discord did not allow server owners to self-designate entire servers as age-

---

[17] Kellen Browning, *5 Ways Young People Are Using Discord*, N.Y. Times (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/business/discord-users-gen-z.html.

restricted, and so minors could easily access servers with age-restricted content even if designated age-restricted channels in the server were blocked. Discord only recently provided server owners with the ability to self-designate entire servers as age-restricted.

58. Roblox is well aware that game developers often collaborate on Discord. First, Roblox's own executives have spoken about how Roblox users communicate off-platform, including Roblox CEO Dave Baszucki: "We see our people who play Roblox use various apps sometimes to hop from place to place and communicate outside of those apps."[18] Second, Roblox's Community Standards lists Discord as one of only a handful of external apps that users are allowed to link to: "When using Roblox, you may not link to, share, or display URLs of any external websites or services, except for: YouTube, Facebook, Discord, X (formerly Twitter), Guilded, and Twitch."[19] Roblox also encourages users to communicate on Discord by allowing users to include their Discord usernames in their Roblox profiles.[20]

59. This is a relatively recent policy for Roblox. In the past, Roblox actually blocked links to Discord servers, claiming, "Since Discord's Terms of Service only allows people aged 13 or older to use their platform and Roblox is a platform for all ages, we cannot risk unfairly exposing underage users to platforms such as Discord."[21]

60. Discord likewise gives users instructions on how to link their Roblox accounts to their Discord accounts, for seamless communication across platforms.[22] The "activity status" on Discord then shows other users, including predators, when they are playing Roblox and what game they are playing. On Discord, users can also send other users the codes for Robux gift cards to redeem on Roblox.

---

[18] Q2 2021 Earnings Call (Aug. 17, 2021).
[19] Roblox Community Standards, Roblox, https://en.help.roblox.com/hc/en-us/articles/203313410-Roblox-Community-Standards (last visited Jan. 1, 2026).
[20] *How to Add Discord to Roblox Profile*, YouTube, https://www.youtube.com/watch?v=tOd-W3kdm44.
[21] *Reminder Regarding Permissible Links*, Roblox (Nov. 2017), https://devforum.roblox.com/t/reminder-regarding-permissible-links/61736.
[22] *How To Connect Your Roblox Account to Discord*, Discord, https://support.discord.com/hc/en-us/articles/32137739104663-How-to-Connect-your-Roblox-Account-to-Discord.



## How to Connect your Roblox Account to Discord

Buffy

4 months ago · Updated

Follow

*Discord's instructions to users on how to connect their Roblox account to their Discord.[23]*

**D.      Roblox and Discord Are Hunting Grounds for Child-Sex Predators.**

61.     For years, Roblox and Discord—both separately and jointly—have served as online platforms of choice for predators seeking to find, groom, abuse, and exploit children

62.     Roblox provides predators with easy access to millions of children and allows these predators to identify and target vulnerable young users. As prominent *Bloomberg Businessweek* journalists put it in describing the arrests of dozens of predators who exploited children using Roblox, "These predators weren't just lurking outside the world's largest virtual playground. They were hanging from the jungle gym, using Roblox to lure kids into sending photographs or developing relationships with them that moved to other online platforms and, eventually, offline."[24]

63.     Many predators on Roblox do not even hide that they are using the platform to hunt children, roaming the virtual playground with usernames like "@Igruum_minors," "@RavpeTinyK1dsJE," and "@EarlBrianBradley"—a reference to one of the most prolific pedophiles ever, who raped and molested hundreds of children.[25]

64.     For years, countless children have been sexually exploited and abused by predators who targeted and groomed them on Roblox. For example, in 2017, Roblox enabled a predator to

[23] *Id.*
[24] Carville & D'Anastosio, *supra* note 11.
[25] *Roblox: Inflated Key Metrics for Wall Street and a Pedophile Hellscape for Kids*, Hindenburg Research (Oct. 8, 2024), https://hindenburgresearch.com/roblox/.

target an eight-year-old child and solicit explicit photos, prompting one mother to observe that Roblox had created "the perfect place for pedophiles."[26] In 2018, Roblox enabled a predator posing as a child to coerce a nine-year-old girl into performing and filming sexually abusive acts on her four-year-old brother through violent threats, including of death, against her family.[27] That year, 24 men in New Jersey were also charged with soliciting sex from minors as part of a sting operation, where the New Jersey State Police Lieutenant specifically called out Roblox as a place where "individuals are posing as someone else" in order "to gain someone's trust."[28] In 2019, a Florida predator used Roblox to target children ages 10-12 and coerce them into sending him naked pictures of themselves.[29] That year, a man in Wales encouraged 150 children to engage in sexual activity by contacting them through Roblox, where he pretended to be a child and used fake names.[30]

65.    During the pandemic, reports of child sex abuse facilitated by Roblox accelerated. In 2020, for example, Roblox enabled a 47-year-old predator to pose as a teenager, target a 16-year-old girl, move the conversation to Facebook, solicit explicit photos and videos, all of which constituted child pornography,[31] and ultimately traffic her across state lines, raping her multiple times.[32] In Michigan, a man was arrested for persuading an eight-year-old girl to send him videos

[26] Pei-Sze Cheng, Evan Stulberger & Dave Manney, *I-Team: Popular Online Gaming Site for Kids is Breeding Ground for Child Sex Predators, Mother Says*, NBC New York (Apr. 6, 2017), https://www.nbcnewyork.com/news/local/video-game-warning-roblox-child-sex-predator-online-site-investigation-what-to-know/87438/.

[27] Briana Barker, *Internet Safety and Your Children: How Kids are at Risk*, Record-Courier (Mar. 27, 2018), https://www.record-courier.com/story/news/2018/03/27/internet-safety-your-children-how/12899346007/.

[28] *Cop, Firefighter Among 25 Charged in Child Luring Sting*, Fox 13 Tampa Bay (Sep. 25, 2018), https://www.fox13news.com/news/cop-firefighter-among-24-charged-in-child-luring-sting.

[29] Max Chesnes, *Deputies Say Vero Beach Man Used Popular Video Game Platforms to Target Children*, TC Palm (Aug. 20, 2019), https://www.tcpalm.com/story/news/crime/indian-river-county/2019/08/20/detectives-advise-online-safety-after-vero-beach-man-used-video-game-platforms-target-minors/2059599001/.

[30] Liz Day, *Paedophile Groomed 150 Children to Engage in Sexual Activity Using Online Game Roblox*, Wales Online (May 10, 2019), https://www.walesonline.co.uk/news/wales-news/paedophile-groomed-150-children-engage-16258877.

[31] U.S. Dep't of Justice, *Magnolia Man Gets Life For Exploiting Young Female He Met and Communicated With Via Roblox and Facebook* (Oct. 15, 2020), https://www.justice.gov/usao-sdtx/pr/magnolia-man-gets-life-exploiting-young-female-he-met-and-communicated-roblox-and.

[32] *United States v. McGavitt*, 28 F.4th 571, 578 (5th Cir. 2022).

of herself, in various stages of undress, in exchange for Robux.[33] The perpetrator had been arrested for similar offenses three years earlier and was a registered sex offender in Kansas. This perpetrator was not the only convicted sex offender who was able to freely create accounts on Roblox: in 2021, a convicted sex offender used Roblox to sexually solicit a 12-year-old child.[34] And in 2022, a 33-year-old man groomed a 13-year-old girl on Roblox, transported her from her home in Kansas to his home in Georgia, and raped her multiple times.[35]

66.    2023 was more of the same. For example, a 30-year-old man was arrested for soliciting illicit photos from young victims and authorities reported that he had three separate Roblox accounts.[36] A 27-year-old man was arrested for kidnapping an 11-year-old girl whom he met on Roblox.[37]

67.    Similar incidents continued throughout 2024. For example, a 21-year-old Chilean man was arrested for traveling to the U.S. to meet an underage girl he met on Roblox, where he had "spent several months manipulating and grooming" her.[38] A 21-year-old in California pled guilty for directing a 10-year-old girl, whom he met on Roblox, to disrobe and touch herself.[39] A 64-year-old man admitted to posing as a 13-year-old boy on Roblox, where he met a 12-year-old

---

[33] *Man Arrested for Inappropriate Relationship with 8-Year-Old Bloomfield Twp. Girl Through Roblox*, WXYZ Detroit (Sep. 24, 2020), https://www.wxyz.com/news/man-arrested-for-inappropriate-relationship-with-8-year-old-bloomfield-twp-girl-through-roblox.

[34] Jeff Bonty, *Man Charged With Soliciting Juvenile Through Roblox*, Daily Journal (Jul. 23, 2021), https://www.shawlocal.com/daily-journal/.

[35] Fox 5Atlanta Digital Team, *Clayton County Man Charged with Sex Trafficking, Rape of 13-year-old Girl He Met on Gaming App Roblox*, Fox5 (Mar. 2, 2022), https://www.fox5atlanta.com/news/clayton-county-man-charged-with-sex-trafficking-rape-of-kansas-girl.

[36] City of Fontana Police Department, *Internet Predator Arrested,* Facebook (Dec. 20, 2023), https://www.facebook.com/watch/?v=338311109095057.

[37] *Man Charged in Kidnapping of 11-year-old He Met Through Roblox from Her NJ Home: Police*, ABC7 (Oct. 21, 2023), https://abc7ny.com/roblox-kidnapping-new-jersey-online-grooming/13927383/.

[38] Grace Toohey, *Chilean Man Groomed 13-Year-Old Girl He Met on Roblox Before Flying to U.S. to Meet Her, Police Say*, L.A. Times (Aug. 22, 2024), https://www.latimes.com/california/story/2024-08-22/chilean-arrest-roblox-child-exploitation.

[39] Ashley Harting, *Online Predator Who Targeted 10-Year-Old on Roblox Pleads Guilty in Butte County*, KRCR (Sep. 25, 2024), https://krcrtv.com/news/local/online-predator-who-targeted-10-year-old-on-roblox-pleads-guilty-in-butte-county.

COMPLAINT                                                                                    19

girl and convinced her to send sexually explicit photos of herself and a young relative.[40] A 29-year-old Michigan man befriended and groomed an 11-year-old girl on Roblox by posing as a teenager and then coerced the girl into sending multiple explicit photos of herself.[41] And a 24-year-old man raped a 10-year-old girl he had met on Roblox.[42]

68.    In 2025, predators continued to enjoy easy access to children on Roblox. For example, in April 2025, a California man was arrested and charged with kidnapping and engaging in unlawful sexual conduct with 10-year-old girl whom he met and communicated with on Roblox.[43] The next month, a 17-year-old Florida teenager was arrested after authorities learned he had been communicating on Roblox with numerous children, some as young as eight years old, over the course of a year and convinced them to send him sexually explicit images of themselves.[44] Just a few days later, a New York man who used Roblox to connect with 11- and 13-year-old girls was arrested and federally charged with enticement and possession of child pornography.[45]

69.    For years, Discord, too, has enabled and facilitated the grooming, trafficking, and sexual abuse of minors. For example, in a June 2023 article, NBC News reviewed publicly available information since Discord was founded and identified 35 cases in the previous six years in which

---

[40] Travis Schlepp, *Man, 64, Admits to 'Catfishing' Girl on Roblox, Convincing Her to Send Explicit Images*, KTLA 5 (Jul. 26, 2024), https://ktla.com/news/california/man-64-admits-to-catfishing-girl-on-roblox-convincing-her-to-send-explicit-images/.

[41] Michael Martin, *Roblox Predator: School Staffer Accused of Grooming West Michigan Child for Illicit Photos*, Fox17 West Michigan (Jan. 16, 2025), https://www.fox17online.com/news/local-news/roblox-predator-school-staffer-accused-of-grooming-west-michigan-child-for-illicit-photos.

[42] Martin Robinson, *Roblox Predator Who Raped 10-year-old Girl is Locked Up: Paedophile Who 'Targeted Child He Met on Gaming Platform Is Jailed for Six Years*, Daily Mail (Jan. 17, 2025), https://www.dailymail.co.uk/news/article-14278563/Roblox-predator-raped-10-year-old-girl.html.

[43] *Elk Grove Man Accused of Kidnapping Kern County Girl He Communicated with on Roblox*, CBS News (Apr. 18, 2025), https://www.cbsnews.com/sacramento/news/elk-grove-man-accused-kidnapping-kern-county-girl-roblox/.

[44] Briana Trujillo, *Ocala 17-Year-Old Convinced Kids to Send Him Sex Abuse Material on Roblox*, NBC (May 2, 2025), https://www.nbcmiami.com/news/local/ocala-17-year-old-convinced-kids-to-send-him-sex-abuse-material-on-roblox-sheriff/3605691/.

[45] U.S. Dep't of Justice, *Fairport Man Who Used Roblox to Attempt to Communicate with Minors for Sex Arrested* (May 6, 2025), https://www.justice.gov/usao-wdny/pr/fairport-man-who-used-roblox-attempt-communicate-minors-sex-arrested.

adults were prosecuted on charges of kidnapping, grooming, or sexual assault that involved communications on Discord.[46] Because these cases were only those that were reported, investigated, and prosecuted during that time, "What we see is only the tip of the iceberg," explained a child safety advocate.

70.    For example, in 2021, a Virginia man was arrested and charged with sexually exploiting and kidnapping a 12-year-old girl from her home in California.[47] According to court documents, the man met and groomed the girl on Discord, flew to California and picked her up at her house at 2:30 a.m., and was arrested at the Denver airport during a layover.

71.    Similarly, in February 2023, a Michigan man was arrested and charged with kidnapping a 14-year-old Washington girl whom he had met and groomed on Discord.[48] The next month, a North Carolina man was arrested and charged with rape, child abduction, and human trafficking after police rescued a 13-year-old from a locked shed behind his house.[49] According to the girl's mother, the man had been communicating with her daughter for months on Discord before he abducted her from her home in Dallas.

72.    2024 brought more of the same. In February, a Texas man was charged with human trafficking and sexual assault of a 16-year-old girl whom he met and communicated with on Discord.[50] The girl told police that the man picked her up in Kansas and brought her to his

[46] Ben Goggin, *Child Predators Are Using Discord, a Popular App Among Teens, for Sextortion and Abductions*, NBC News (July 21, 2023), https://www.nbcnews.com/tech/social-media/discord-child-safety-social-platform-challenges-rcna89769.
[47] Dan Morse, *With Children Stuck at Home During Coronavirus Shutdowns, Online Sexual Predators Can Swoop In*, Wash. Post (Feb. 12, 2023), https://www.washingtonpost.com/local/public-safety/coronavirus-lockdown-child-exploitation/2021/02/04/90add6a6-462a-11eb-a277-49a6d1f9dff1_story.html.
[48] Ruth Bashinsky, *Washington State Girl, 14, Who Went Missing with "Man She met on Discord" Near Notorious Sex Trafficking Corridor FOUND: Michigan Man Arrested over Kidnapping*, Daily Mail (Feb. 1, 2024), https://www.dailymail.co.uk/news/article-13034633/washington-state-girl-missing-discord-sex-trafficking-michigan.html.
[49] Peter Charalambous & Alexandra Faul, *Missing 13-year-old Rescued from Locked North Carolina Shed*, ABC News (Mar. 14, 2023, https://abcnews.go.com/US/missing-13-year-rescued-locked-north-carolina-shed/story?id=97830147.
[50] Brittany Eubank, *Man and His Mother Charged After Missing Kansas Teen Found Safe in*

apartment in Texas, where they had sex multiple times. A few months later, a North Carolina man was charged with kidnapping and raping a 12-year-old girl he had met on Discord.[51] Around the same time, a Pennsylvania man was arrested and charged with multiple offenses, including rape of a child and indecent assault of a person less than 13 years of age.[52] The police investigation revealed that the man was communicating with the 12-year-old boy on Discord, which included sexual conversations and making plans to meet.

73.    Roblox and Discord frequently work in tandem to facilitate child sexual exploitation and abuse. For example, in 2019, a Florida man was arrested after law enforcement learned that he was using Roblox and Discord to target children.[53] According to authorities, the man targeted children between ages 10 and 12 on Roblox and then coerced them on Discord into sending sexually explicit images of themselves in exchange for Robux.

74.    Similarly, in January 2022, a Florida man was arrested following a lengthy investigation that revealed that he posed as a teen girl on Roblox to meet a 13-year-old boy and then convinced to boy to send him sexually explicit images on Discord in exchange for Robux.[54] Later that year, an Arizona man was arrested for kidnapping a 13-year-old boy he met on Roblox.[55]

_Central Texas_, KVUEabc (Feb. 8, 2024), https://www.kvue.com/article/news/crime/austin-human-trafficking-sexual-assault-missing-kansas-teen/269-361c25e3-12a8-4ec4-8779-0f962c12e8d1.

[51] _"Under 13 Is Under 13": Judge Responds to Attorney's Claim That Man Charged with Kidnapping & Rape Believed 12-year-old Girl Was College Student_, WRAL News (Apr. 16, 2024), https://www.wral.com/story/under-13-is-under-13-judge-responds-to-attorney-s-claims-that-man-charged-with-kidnapping-rape-believed-12-year-old-girl-was-col/21381250/.

[52] Keith Heffintrayer, _Four Men Arrested Following Investigation into Sexual Abuse of 12-year-old Boy in Upper Gwynedd_, NorthPennNow (Apr. 15, 2024), https://northpennnow.com/news/2024/apr/15/four-men-arrested-following-investigation-into-sexual-abuse-of-12-year-old-boy-in-upper-gwynedd-police-say/.

[53] Max Chesnes, _Deputies Say Vero Beach Man Used Popular Video Game Platforms to Target Children_, TCPalm (Aug. 20, 2019), https://www.tcpalm.com/story/news/crime/indian-river-county/2019/08/20/detectives-advise-online-safety-after-vero-beach-man-used-video-game-platforms-target-minors/2059599001/.

[54] Irene Wright, _Man Blackmailed Teen Boy as He Posed as Girl on Roblox and Discord, Florida Cops Say_, Miami Herald (Aug. 11, 2023), https://www.miamiherald.com/news/state/florida/article278172607.html.

[55] Jerry Lambe, _Arizona Man Allegedly Kidnapped a Buy He Lured from Discord. Police Say They Rescued the Victim Thanks to an "Alert Gas Station Attendant,"_ Law & Crime (Dec. 29, 2022),

According to police, the man sent sexual and inappropriate messages on Roblox to the boy and then invited him to join a Discord chat, where the man arranged to pick the boy up from his house.

75.    These real-life nightmares occurred repeatedly throughout 2024. In November 2024, for example, the FBI arrested a Michigan man and charged him with numerous crimes related to his sexual exploitation of possibly over 100 children.[56] The man told law enforcement that "he used Roblox to talk to others sexually, some of whom he allegedly knew were children," and then transitioned the conversations to Discord and coerced the children into sending nude images.[57]

76.    And in January 2025, a Louisiana man was arrested and federally charged for sexually exploiting a teenage girl through Roblox and Discord.[58] According to arrest records, the man "began communicating with her on Roblox, before transitioning her to Discord," where he coerced her into sending sexually explicit images of herself.[59]

77.    The National Center on Sexual Exploitation ("NCSE") has consistently named Roblox and Discord to its "Dirty Dozen" list—an annual campaign exposing companies that facilitate, enable, or profit from sexual exploitation. The NCSE blasts Roblox for "treat[ing] child protection like a game."[60] According to the NCSE, "[u]ntil basic child protection standards are met, Roblox remains too high risk for kids."[61] As to Discord, as the NCSE put it, "Discord enables

---

https://lawandcrime.com/crime/arizona-man-allegedly-kidnapped-a-boy-he-lured-from-discord-police-say-they-rescued-the-victim-thanks-to-an-alert-gas-station-attendant/.

[56] Samantha Sayles, *Monroe County Man Uses Roblox, Discord, Snapchat to Sexually Assault Children*, ClickOnDetroit (Nov. 15, 2024), https://www.clickondetroit.com/news/local/2024/11/15/monroe-county-man-uses-roblox-discord-snapchat-to-sexually-exploit-children/.

[57] *Id.*

[58] WAFB Staff, *Man Accused of Internet Sex Crimes Allegedly Met Victims on Roblox, Discord*, WAFB (Jan. 31, 2025), https://www.wafb.com/2025/01/31/man-accused-internet-child-sex-crimes-allegedly-met-victims-roblox-discord/.

[59] *Id.*

[60] National Center on Sexual Exploitation, *The Dirty Dozen List '24: Roblox*, https://endsexualexploitation.org/roblox/ (last updated Dec. 4, 2024).

[61] *Id.*

exploiters to easily contact and groom children," and predators "take advantage of Discord's dangerous designs to entice children into sending sexually explicit images of themselves.[62]

78.    Roblox claims that child safety is its top priority, but the reality is that the company has consistently prioritized user growth over child safety. Eight current and former Trust and Safety employees at Roblox told a reporter exactly that, describing management's refusal to respond to their request for more resources, which resulted in a backlog of incident reports that went uninvestigated.[63] Additionally, these employees explained that obvious design changes, such as ensuring that safety settings were put on by default, were vetoed by management.

79.    Similarly, despite Discord's repeated assurances to parents that it has a "zero tolerance" policy for the criminal acts described above and that its product is built on safety, the rampant sexual exploitation of children on Discord has gotten only worse over the years—not better. John Shehan, the Senior Vice President of the NCSE, emphasized that his organization has seen "explosive growth" in CSAM and exploitation on Discord.[64] "There is a child exploitation issue on the platform. That's undeniable," he stated.

### E.    Sonic Eclipse Online, a Popular Roblox Game, Was Built on Child Labor.

80.    *Sonic Eclipse Online*, a game on Roblox, was launched in late 2018.[65] The game took the famous Japanese hedgehog video game and franchise and allowed users to immerse themselves in its world and complete various challenges and activities, like collecting rings. *Sonic Eclipse Online* itself was a relaunch of *Sonic Simulator*, a prior, similar game that first appeared on Roblox in 2016.

---

[62] National Center on Sexual Exploitation, *The Dirty Dozen List '24: Discord*, https://endsexualexploitation.org/discord/.
[63] Carville & D'Anastosio, *supra* note 11.
[64] Goggin, *supra* note 46.
[65] Parkin, *supra* note 13.

*The Sonic the Hedgehog character that Sonic Eclipse Online was based off of.[66]*

81.    The game's creator went by the username DoctorRofatnik on Roblox's platform. On the corresponding Discord channel used to build and maintain the game, DoctorRofatnik went by the name Jadon Shedletsky or Jacob Shedletsky, and claimed that he was the younger brother of John Shedletsky, Roblox's long-time creative director. DoctorRofatnik's character was known to wear a tall white hat, red tie, and an American flag pin, resembling Uncle Sam.

82.    The DoctorRofatnik Roblox account was created in July 2012.[67] On his profile page, DoctorRofatnik described himself as a "Game Developer, Industry Visionary, Team Leader of Warhead Entertainment, and a bit braggadocious." He also wrote that he was a "man with many flaws." DoctorRofatnik's account had more than 14,000 followers, demonstrating his popularity. Warhead Entertainment was the name of the developer group that DoctorRofatnik ran for his games. Beyond *Sonic Eclipse Online* and *Sonic Simulator*, Warhead Entertainment was responsible for several more Sonic the Hedgehog-related games on Roblox.

83.    Warhead Entertainment also had a Patreon page. Patreon is a membership and subscription platform where creators can earn money directly from their audience by offering different tiers with different perks. In exchange for exclusive access to certain games and early access to certain features, Roblox users paid between $1-2 a month.[68] At its peak, Warhead

---

[66] *Sonic the Hedgehog*, Sonic WikiZone, https://sonic.fandom.com/wiki/Sonic_the_Hedgehog.
[67] *Uncovering Roblox's Worst P\*dophile*, YouTube (Apr. 24, 2025), https://www.youtube.com/watch?v=3-xc-JXvMc8&t=3s.
[68] WarHead Entertainment, Patreon, https://archive.is/giEGD.

Entertainment's Patreon page was earning $4,800 a month.[69] The Patreon page claimed that all subscription fees went toward the developer team's "growth and development," including "[h]iring more artists for Artwork, Music, Voice Acting, and other various forms of content" and "pay[ing] for any emergencies any of our developers face during downtimes of the Team."[70]

84.    DoctorRofatnik also had an active YouTube channel under the username ThejetermanRBLOX. The YouTube channel had 10,200 subscribers and was also created back in 2012. The most popular videos on his YouTube channels were recordings of game scenes from Sonic Eclipse Online and other Sonic games, with some of these videos having hundreds of thousands of views. One Sonic-related video even garnered a million views. However, some of ThejetermanRBLOX's videos also addressed various controversies surrounding his Roblox account, including one video, posted in December 2017, addressing allegations lobbed at him, from another Roblox popular developer, that he was racist and a neo-Nazi.



*An image taken from the Sonic Eclipse Online game on Roblox.[71]*

85.    Appealing to children who were big fans of the Sonic franchise, *Sonic Eclipse Online* quickly became a popular game on Roblox. At its peak, it had more than 67,000 members. Warhead Community, the development group that DoctorRoftanik controlled, had more than 133,000

---

[69] *Id.*
[70] *Id.*
[71] *Sonic Eclipse is Back! - Sonic Eclipse Revival (Sonic Roblox Fangame)*, YouTube (Sep. 29, 2022), https://www.youtube.com/watch?v=b4Y2-_W9kd0.

members.[72]

86.    DoctorRoftanik and his team further monetized their game, creating cosmetics themed after the game to continue exploiting the game's popularity. Users could pay 400 Robux for a Sonic costume for their avatar.

87.    To keep up with demand for the game, DoctorRofatnik turned to child programmers, artists, and designers, offering them the opportunity to participate in the game's development. For many of these children, DoctorRofatnik was an iconic member of the Roblox community given his success in creating *Sonic Eclipse Online*, and an invitation to participate in the game's development was an honor. But the work environment quickly turned toxic: one of these young developers felt pressured to work constantly by DoctorRofatnik and began to experience burn-out. He explained to a news outlet that he worked constantly on *Sonic Eclipse Online* from ages 12 to 14, and that the work began to have a negative impact on his mental health.[73]

88.    *Sonic Eclipse Online* also turned to child users to become community moderators on Roblox. A moderator is an unpaid role where the user works to help other players in the Roblox game. Moderators build community by welcoming new members and answering questions, testing new features of games, and monitoring play. One user was 12 years old when she began moderating for *Sonic Eclipse Online*.[74]

**F.    Roblox's and Discord's Notice of DoctorRofatnik's Predatory Behavior.**

89.    The *Sonic Eclipse Online* and Warhead Entertainment development team mainly communicated on Discord, which offered more features that made it easier to collaborate on game development in comparison to Roblox's chat function for developer teams. The Discord collaboration was organized into various channels for specific workstreams, but also had "social" channels where developers chatted. The *Sonic Eclipse Online* game on Roblox contained a link to

---

[72] *Warhead Community*, Roblox, https://web.archive.org/web/20220621152612/https://www.roblox.com/groups/3371645/Warhead-Community#!/about.
[73] Parkin, *supra* note 13.
[74] Parkin, *supra* note 13.

the Discord channel.



*The link to* Sonic Eclipse Online's *Discord channel on Roblox.*[75]

90.    DoctorRofatnik went by the Discord username "Alive Inside Mephiles" or "Dead Inside Mephiles," and his documented inappropriate behavior on Discord dates back as early as 2017. First, other Roblox users complained about DoctorRofatnik's racist language, which led to DoctorRofatnik posting a public response video on YouTube.[76] Second, DoctorRofatnik sent countless inappropriate and predatory messages to numerous underage female members of the Discord channel.

91.    To one user, who was a 12-year-old girl at the time, he messaged her:[77]

- "You're 12, I expect you to be a little slow on the upbringing, but soon I'll corrupt you beyond your wildest dreams."

- "You are one of the few to fuel my lust <333"

- "It's not Sexual Assault if the girl calls you daddy halfway through it"

- "You're the reason why I'm gonna end up behind bars 😄."

- "You're so hot it makes it painful to think about waiting a year"

- "Words cannot explain what I want to do with you"

---

[75] *The Roblox Developer Arrested by the FBI*, YouTube (Oct. 31, 2022), https://www.youtube.com/watch?v=wdDfdlLuAgA.
[76] *Id.*
[77] *The DoctorRofatnik Archives*, Google Docs, https://docs.google.com/document/d/1IBLEag66elaVPs11PimO2t2M0ikCCb67ti_RNYB0MxQ/edit?tab=t.0.

- "[Y]ou're more fun screaming"

- "[W]hy kill you If I can violate you instead"

92.    When the same 12-year-old girl wrote, "end me pls," he wrote back "no I'll rape you instead."[78] He would also reference his erection to her, comment on her appearance, and told her, "[Y]ou like fantasizing about being abused and forced against your will."[79] When she told him he was a "pedo," he responded, "you know what they say"—"the younger the better."[80]

93.    She later left the Discord channel and the *Sonic Eclipse Online* community on Roblox early in 2020 and began speaking out about DoctorRofatnik's predatory behavior. Horrified, her friends published the Discord messages referenced above in a public Google document. The Google document begins by giving an overview of DoctorRofatnik's role in the *Sonic Eclipse Online* world. Then, the author explains why the document was being published: "I'm writing this document mostly in focus of his acts of sexual predatory behavior, specifically to minors."[81] The author adds, "[W]hat he did is not right for a 27-year-old male…[H]e showed himself off as a creepy, manipulative, and overall, scummy person."[82]

94.    Before pasting the messages between the 12-year-old girl and DoctorRofatnik, the author also identifies exactly what was wrong with DoctorRofatnik's messaging: "This grown adult was **normalizing** such behavior for a **young and naive child**," and "[E]ncouraging someone so young to even talk about stuff like that to you, or anybody, let alone **privately** or to a **grown adult** is NOT OK."[83]

95.    After publishing screenshots of countless messages from DoctorRofatnik to the 12-year-old girl, the Google doc then details DoctorRofatnik's inappropriate behavior to other underage developers and staff members of the *Sonic Eclipse Online* community. To one 15-year-old girl, he

---

[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.* (emphasis in original).

demanded to see pictures of her, and when she refused, he responded aggressively to pressure her into sending a photo.

96. The Google doc detailing DoctorRofatnik's predatory behavior was widely circulated among the *Sonic Eclipse Online* and broader Roblox community. One person who came across the Google doc was Ben Simon, the real name of the Youtuber "Ruben Sim." Simon reposted those messages on Twitter, broadening the reach of the Google doc. Ultimately, dozens if not hundreds of Roblox and Discord users, horrified by DoctorRofatnik's behavior, expressed their outrage to DoctorRofatnik on Roblox and Discord.

97. In response, DoctorRofatnik posted a YouTube video to his ThejetermanRBLOX account. Using a voice changer, he admitted that *all the messages in the Google doc were real* and that they were *wrong*, but claimed that he had just been joking, with "no intention of moving on anything" he said. In addition to blaming his dark sense of humor, he also claimed he sent the messages to "fuel his ego" and that he derived "no sexual enjoyment" from the messages. DoctorRofatnik also victim-blamed, claiming that the girl to whom the Google doc documented the most inappropriate messages was "sending messages like this with others before him" and that he only engaged with her so that she would be "more comfortable" participating in the *Sonic Eclipse Online* community. Finally, he accused the girl of accusing him only to seek attention for herself.

98. In his response video, DoctorRofatnik also enlisted members of his Warhead Entertainment development community to defend him. He included screenshots of these users' Roblox accounts and audio recordings of them defending him. Each of these "testimonials" acknowledged that his messages to the underage users were "not okay" and that there was "no excuse" for his messages. Yet each user defended him and claimed that "he is by no means a pedophile" and that he "did not want to indulge in anything illegal for his own safety and the safety of the victims," an insistence that speaks volumes. What DoctorRofatnik neglected to mention (but which was information that Roblox had access to via knowledge of who was using its developer studio) was that each one of these users was a contributor to DoctorRofatnik's games on Roblox and thus had a vested stake in seeing him and his games remain on the platform.

99. The *Sonic Eclipse Online* and broader Roblox community was incensed by DoctorRofatnik's response. The same group of concerned users posted a responsive Google doc addressing the response and DoctorRofatnik's friends, who had come to his defense. First, on whether DoctorRofatnik was in fact "joking," the Google doc said, "No matter how you look at it, these actions were upon those of pedophilic behavior. That's an indisputable fact, having constant sexual fantasy discussion with a child jokingly or not, is pedophilic behavior." As evidence that DoctorRofatnik was *not joking*, the Google doc pointed to him continuing his messages even when the recipients expressed discomfort. Second, the responsive Google doc contained additional messages that DoctorRofatnik sent to other users on Discord, including screenshots of explicit sexual material. DoctorRofatnik sent such pornographic material to users he *knew were underage*.

100. The Google doc was not the only response. Ben Simon, the YouTuber, also addressed DoctorRofatnik's defense by creating a video detailing all of the messages and DoctorRofatnik's admission that the messages were real. Then, he sent the video to a Roblox employee and asked that Roblox shut down DoctorRofatnik's account and the *Sonic Eclipse Online* game. Other users and at least one parent also complained to Roblox about DoctorRofatnik's behavior, both through official reporting channels and through off-platform communications with Roblox staff and community members.

101. Ben Simon was even contacted by a member of Roblox's development team. However, the initial response from the Roblox staff member was to put the onus on Simon, rather than Roblox, to determine that the identity of the Discord user and the Roblox user were the same. The Roblox staff member also claimed that "off-site" conduct was not "directly punishable by Roblox." Simon, however, was easily able to show that the user sending the inappropriate messages on Discord was the same as DoctorRofatnik—by sending DoctorRofatnik's video response.

HI rubensim, I saw your tweet about the user DoctorRofatnik and would like to get this concerning situation handled.

Since the screenshot was taken in discord, it is considered off-site and is not directly punishable by Roblox. (To that end, be sure to submit a report to Discord: support.discord.com/hc/en-us/artic...)

If you can somehow prove the discord user is the same person as the linked Roblox user, there may be a case. Perhaps the person is verified with RoVer or bloxlink or some other verification service, or they have posted screenshots logged in as their Roblox user.

Any more context to the situation would be helpful. Be sure to save the offending discord message IDs now in case they are deleted later.

*Ben Simon's messages with a Roblox employee.*[84]

He has a YT channel linked to his Roblox profile where he uploaded a response video, admitting to all of the messages and even showing the same screenshots that were in the document.

youtu.be/zsOUyA3boxs



also off-site behavior has always been directly punishable by roblox, even if they don't specify it in their terms of service

102.    Roblox's response was to close DoctorRofatnik's account. It declined to shut down *Sonic Eclipse Online* because it claimed that the game itself did not pose any safety concerns. DoctorRofatnik was defiant—he transferred ownership of the game to his friend and created new accounts, many of which Roblox failed to block. And he publicly boasted that his games continued to make money. On Twitter, he posted a screenshot of a $15,097.35 payment from Roblox, thus showing that even *after his ban*, he was still monetizing the *Sonic Eclipse Online* game.

---

[84] *The Roblox Developer Arrested by the FBI*, *supra* note 75.



*DoctorRofatnik, on Twitter, indicating that he was still profiting from his games on Roblox even after he was "banned."*[85]



*DoctorRofatnik, on Discord, indicating that he had other sources for making money on Roblox.*[86]



*DoctorRofatnik, on Discord, bragging that revenue for his games actually increased as a result of the controversy over his inappropriate communications with minors.*[87]

---

[85] *Id.*
[86] *Id.*
[87] *Id.*

103. Roblox users were incensed. Ben Simon, the Youtuber, wrote to the company, "Roblox's bottom line depends on parents trusting the company with their kids' safety and that's not going to happen if this is the response to child predators."[88] Specifically, Simon alerted Roblox that if the company "really wanted to protect their users they'd have deleted his game…and curbed his Roblox income." Simon also directly told the Roblox staff member that *Sonic Eclipse Online* was violating Roblox's own terms of service. He did not get a response.

This has been a really weak response on Roblox's part. I've proven that he's a child predator using Roblox to groom kids but so far the only thing that's happened is his non-devex account was deleted and Roblox is still doing business with his game.

If devrel really wanted to protect their users they'd have deleted his game (already in violation of section B.5.c of the TOS) and curbed his Roblox income. Roblox's bottom line depends on parents trusting the company with their kids' safety and that's not going to happen if this is the response to child predators.

5:41 / 12:35    Sep 28, 2020, 4:55 PM

*YouTuber Ben Simon's messages to a Roblox employee in response to their failure to remove DoctorRofatnik's games from Roblox.*[89]

104. A few months later, Simon noticed that Roblox was continuing to link DoctorRofatnik's Discord server to the *Sonic Ecliipse Online* game. Knowing that Discord was where DoctorRofatnik had sent countless inappropriate messages to minors, he again messaged a Roblox staff member to ask that the Discord link be removed. Yet the staff member claimed that there was nothing Roblox could do: "Even if we did, they could just add it back again."

---

[88] Carville & D'Anastosio, *supra* note 11.
[89] *The Roblox Developer Arrested by the FBI*, *supra* note 75.



*YouTuber Ben Simon's messages to a Roblox employee asking Roblox to remove the link to the Discord server, where DoctorRofatnik had sent countless inappropriate messages to minors, and the Roblox staff member responding that there was nothing to be done.*[90]

105.    Fed up with Roblox's failure to remove DoctorRofatnik's games, one friend of a young user that DoctorRofatnik had groomed, who had previously tried to report his account, wrote to Sega Sammy Holdings Inc., the Japanese company that owns the Sonic the Hedgehog franchise, to inform the company that its intellectual property was being used by a child predator. Sega swiftly moved to demand that Roblox remove the game for infringement.

106.    In the end, it was not the verified allegations of predatory conduct that caused *Sonic Eclipse Online* to be deleted from Roblox's platform. Rather, it was the threat of copyright infringement liability that caused Roblox to act, finally removing *Sonic Eclipse Online* in December 2021, more than a year after Roblox users had repeatedly alerted the company to the dangers that the game posed.

107.    Roblox, however, was on notice that the Warhead Entertainment team intended to continue developing games for the platform. First, even when DoctorRofatnik's account was banned, he was able to seamlessly transfer ownership of his development group, Warhead Entertainment, to a friend. Second, on the Patreon page for Warhead Entertainment, after *Sonic*

---

[90] *Id.*

*Eclipse Online* was shut down, one member wrote, "[W]e…have begun work on alternative projects," and explained his team's intention to "work[] on our new project and get[] our affairs in order with Roblox, changing our Patreon and Discord, and moving our group."[91] So, Roblox and Discord were fully aware that a predator was continuing to use their platforms.

108.    Not only was DoctorRofatnik's predatory behavior aired publicly among the Roblox and Discord communities, but it was also covered by the mainstream media. In January 2022, just a month or so after *Sonic Eclipse Online* had been shut down, *The Guardian*, a well-respected British newspaper, ran a detailed exposé on DoctorRofatnik's inappropriate behavior and Roblox's failure to remove the *Sonic Eclipse Online* game until Sega threatened copyright infringement action. *The Guardian* reporter spoke to many of DoctorRofatnik's victims, who further detailed his pattern of grooming and inappropriate behavior. One victim, now old enough to understand what DoctorRofatnik had done to her, described *Sonic Eclipse Online* as a "cesspool of toxicity."[92]

109.    The exposé in *The Guardian* also provided more notice that DoctorRofatnik continued to profit from *Sonic Eclipse Online* even after he had been "banned." The exposé explained that DoctorRofatnik was still providing "narrative consultancy" to Warhead Entertainment games despite his ostensible "ban" because DoctorRofatnik was able to transfer ownership of Warhead Entertainment's games to a friend. Additionally, the article identified that DoctorRofatnik had continued to receive payments from Roblox for Robux transactions within the games. DoctorRofatnik was quoted as boasting, just one month prior, "I make more with Roblox than both of your parents combined," despite ostensibly being "banned."[93]

110.    Despite Roblox's acknowledgement of user and parent reports on DoctorRofatnik, Roblox refused to comment on DoctorRofatnik or *Sonic Eclipse Online* for *The Guardian* article. Indeed, Roblox provided no public information as to why DoctorRofatnik's account was banned, such as his violations of community safety standards.

---

[91] *Extremely Important Announcement*, Patreon (Jan. 1, 2022), https://www.patreon.com/posts/extremely-60615782.
[92] Parkin, *supra* note 13.
[93] *Id.*

111. Around the same time as *The Guardian* report was published, in January 2022, eagle-eyed Roblox users deduced DoctorRofatnik's real identity. By combing through all of his social media, the child users had found an old Facebook page that contained a link to a website that was registered to Arnold Castillo, a New Jersey resident. They also identified several of his family members. Some members of the Roblox community even tried to report Castillo to law enforcement. Roblox, however, did not.

112. Instead of doing the same thing as the child users of Roblox—determining DoctorRofatnik's real identity to report him to law enforcement—and despite being on notice that DoctorRofatnik was still using its platform, Roblox never contacted or warned any of the children working for him, and never communicated with users on the platform at large about him. Rather than taking *Sonic Eclipse Online* off of its platform and ending the environment where DoctorRofatnik enjoyed complete control and power of children, Roblox went on the offensive against Ben Simon, the YouTuber who created a video of the allegations and reported it to Roblox, filing a $1.6 million lawsuit against him that alleged that he was the leader of a "cultlike cybermob" who was damaging its reputation.

### G. Castillo Grooms Plaintiff, then Kidnaps, Traffics, and Rapes Her.

113. Plaintiff, who began playing *Sonic Eclipse* Online when she was younger, learned of DoctorRofatnik based on his larger-than-life reputation on Roblox. In admiration, she reached out to him on his YouTube channel in January 2022, and when he invited her to join the *Sonic Eclipse Online* Discord channel, she accepted. Soon, the communications between Plaintiff and Castillo accelerated. They exchanged phone numbers, began texting and eventually spoke on the phone, sometimes for hours at a time.

114. Castillo, aware of the public accusations against him, spent much of his time convincing Plaintiff that the allegations were false. Plaintiff found his denial convincing, particularly because Roblox had taken no meaningful action against him, and because he still had accounts on the platform. In fact, soon after they met, Castillo had friended her on Roblox via his account with the username "LastOutlawz," which had been created after Roblox banned him in September 2020. They played many games together on Roblox, and soon, Castillo invited her to

work for his Roblox games as an artist. She was paid for that art, just like the dozens of other children whose work had gone into Warhead Entertainment's games.

115. In early 2022, Castillo began grooming Plaintiff, who was 15 years old at the time. He exploited her age and vulnerabilities, telling her that she was beautiful and engaging in sexually explicit conversations with her. In February 2022, using Instagram and Discord, Castillo sent messages that discussed showering with her and telling her that he wanted to "make love" to her and "have kids."[94] In March, Castillo told Plaintiff that she would find out soon the sounds of them having sex. He also discussed "fingering" Plaintiff and wanting to "explore" her body, as well as oral sex. When Plaintiff expressed concern that she did not know how to have sex, he reassured her that it was "instinctual."

116. After these specific conversations, Castillo also began sending Plaintiff food and gifts, including McDonald's food delivery via Doordash, and gifts from Amazon, including various tools to help her work as an artist for his games and even a tablet computer.[95] The total cost of these gifts was thousands of dollars.[96]

117. The explicit conversations continued in April 2022—Castillo discussed Plaintiff's "hymen" and told her, "Now I just need to make you a woman in the bedroom."[97] Even when Plaintiff expressed that she might be too young for sex, he told her, "[Y]ou're not." He also pledged that he would "deflower" her.

118. Sometime between April and May 2022, Castillo used the Uber application to contact drivers in an attempt to hire a driver to transport Plaintiff from Indiana to New Jersey.[98] He located a willing driver and communicated with the driver on the Uber application, and then moved

---

[94] Government's Sentencing Memorandum, *United States v. Castillo*, No. 1:22-cr-124 (S.D. Ind. Aug. 16, 2023), ECF No. 58.
[95] *New Jersey Man Sentenced to 15 Years in Federal Prison After Grooming Minor Online and Transporting Her Across States Lines via Uber for Sex*, United States Attorney's Office (Aug. 30, 2023), https://www.justice.gov/usao-sdin/pr/new-jersey-man-sentenced-15-years-federal-prison-after-grooming-minor-online-and.
[96] Exhibit A to Motion to Unseal Arrest Warrant, *United States v. Castillo*, No. 1:22-cr-00124 (S.D. Ind. Jun. 6, 2022), ECF No. 7-1.
[97] Government's Sentencing Memorandum, *supra* note 94.
[98] *Id.*

the conversation off platform to arrange for the driver to pick up Plaintiff from her residence and drive all the way to his home in Paterson, New Jersey.

119. On May 3, 2022, Castillo paid this driver $500 via CashApp and the driver went all the way to Indiana to pick Plaintiff up from her home, and then drove her back to Castillo's home in New Jersey. Upon delivering Plaintiff to Castillo's home, Castillo paid the driver another $500 in cash, for a total cost of $1,000.

120. When Plaintiff arrived, Castillo sexually abused her multiple times and used Uber to have others purchase or attempt to purchase the "Plan B" pill to prevent Plaintiff from becoming pregnant. Castillo also purchased hair dye in an effort to disguise Plaintiff's identity. For days after, Plaintiff's family and law enforcement frantically searched for her.

121. Finally, law enforcement was able to find Plaintiff after connecting a new log-in from Plaintiff's Instagram account to the location of the device's IP address. When police officers and FBI agents arrived at the scene, they determined that DoctorRofatnik was Castillo, the same individual that the Roblox community had identified as DoctorRofatnik months earlier.

122. Castillo was carrying three unused condoms on him and was arrested immediately. He admitted to raping Plaintiff multiple times. He had confined Plaintiff to a "tiny, dank room" in a building next to his residence, with only a dirty twin mattress on the floor.[99] She was completely dependent on him for food and water, and he controlled her movements.

123. When law enforcement accessed Castillo's Roblox messaging history, they found messages with Plaintiff about her running away from home.[100] Additionally, law enforcement found screenshots of Castillo's avatar and Plaintiff's avatar holding hands and embracing in matching T-shirts that said "Boyfriend" and "Girlfriend." Castillo was now using the username "LastOutlawz."

124. During its investigation, law enforcement also came across DoctorRofatnik's prior controversy on Roblox, including the Google doc detailing Castillo's inappropriate messages and

---

[99] *Id.*
[100] Carville & D'Anastosio, *supra* note 11.

COMPLAINT                                                              39

his YouTube video response. Based on that information, the FBI special agent wrote in his affidavit for Castillo's arrest that he "suspect[ed] that CASTILLO may have been using social media in 2020 to attempt to communicate, lure, and exploit other juvenile females."[101]

125.    Castillo pled guilty to Transportation of a Minor with Intent to Engage in Criminal Sexual Activity and Coercion and Enticement of Minor. He is now serving a 15-year sentence in federal prison.

126.    Today, Plaintiff is a 19-year-old who will never be the same as a result of the devastating physical and psychological trauma she has experienced. As the Government said in Castillo's sentencing hearing, "[S]he's been robbed of her sense of safety, her ability to trust, her belief in the goodness of humanity."[102] Fundamentally, "The emotional toll…is immeasurable" and "these scars will remain with her forever."

### H.    Roblox and Discord Failed Plaintiff.

127.    Roblox and Discord's own users, many of them children, had identified Castillo as a child predator *months* before he kidnapped, trafficked, and raped Plaintiff, all based on information publicly available on the internet. These users reported concerns directly to the companies, aired their concerns publicly, and even enlisted a major, international newspaper to cover Castillo's inappropriate conduct. Yet Castillo was still able to make accounts and groom children on Roblox, and his development group, Warhead Entertainment, was never taken offline, nor was his biggest game, *Sonic Eclipse Online*, in response to his documented predatory behavior. On Discord, even though dozens of Castillo's predatory messages were published online, which he admitted were real, Castillo was able to keep his account and his channel.

128.    These users begged Roblox to shut down *Sonic Eclipse Online* because they knew that Castillo would simply resurface on Roblox under a different account, given how easy it was for users to make multiple accounts. Additionally, they knew that as long as *Sonic Eclipse Online* and Warhead Entertainment were active on Roblox, Castillo would lurk on Roblox. Indeed, Ben Simon,

---

[101] Exhibit A to Motion to Unseal Arrest Warrant, *supra* note 96.
[102] Transcript of Proceedings Change of Plea/Sentencing Hearing, *United States v. Castillo*, No. 1:22-cr-00124 (S.D. Ind. May 8, 2024), ECF No. 67.

the YouTuber, specifically told Roblox that without curbing income from *Sonic Eclipse Online* or Warhead Entertainment, Castillo, even if ostensibly banned, would still pose a threat to child users.

129.    Ben Simon was right. At Castillo's sentencing hearing, his own criminal defense attorney admitted that Castillo made "good money" with his earnings from Roblox and that "some of that money was put to use in these crimes that are before us today."[103]

130.    Castillo himself bragged publicly that even after DoctorRofatnik's account had been banned, he was still receiving payments from Roblox for *Sonic Eclipse Online*'s earnings, alerting the Roblox community members to his continued presence on the platform. Additionally, the Roblox community members knew that Castillo's predatory behavior, even if had been ostensibly banned, attracted other predators to the game, knowing that such behavior was tolerated and endorsed by the leadership and development team of *Sonic Eclipse Online*.

131.    If children on the internet, using publicly available sources, could identify DoctorRofatnik as Castillo, then Roblox certainly could have too. Indeed, the bank account information used to send payments to DoctorRofatnik's account alone would have identified him.

132.    Ironically, Roblox has shut down more than 100 of Ben Simon's Roblox accounts, in response to his YouTube videos accusing Roblox of not doing enough to protect children, but Castillo's latest account, LastOutlawz, the one he used to play Roblox with Plaintiff and pretend to be Plaintiff's boyfriend, was never shut down. Castillo used that LastOutlawz account not only to continue to interact with others on Roblox, including Plaintiff, but also to store *Sonic Eclipse Online* assets and test versions of the game, which he would play with Plaintiff on Roblox.

133.    While Roblox more recently has publicly touted changes to its platform, its prioritization of user growth and profit over child safety by parading and platforming known child predators has only continued. Recently, Roblox invited several known predators to its 2025 Developers Conference—a high-profile, invitation-only gathering of top Roblox game developers and company executives that functions as both a reward and an incentive program.[104] By giving

---

[103] *Id.*
[104] *Roblox Developers Conference*, Roblox, https://create.roblox.com/docs/creator-programs/rdc.

coveted conference passes, networking opportunities, and public recognition to high-grossing or popular creators regardless of their misconduct, Roblox signals that what matters most is keeping the pipeline of lucrative games and in-game purchases flowing.

134.    The conference's glitzy presentations, exclusive access to staff, and developer perks are meant to inspire developers to keep building content—and therefore revenue—for Roblox, even if that means overlooking serious child-safety risks in the process. Roblox's red-carpet treatment of these predators directly mirrors how it continued to platform Castillo and reveals its prioritization of user engagement, which translates into revenue, over children's safety.

135.    Like Castillo, one user with the username "FlynnsCorner" was a well-known designer on Roblox, as he created items, such as accessories for avatars, that had sold well in the Roblox Creator store. Like Castillo, this user also had been exposed publicly for making unwanted sexual advances towards minor users.[105] And yet, Roblox still invited him to the Developers Conference, once again platforming a successful developer at the expense of child safety.

136.    Worse, the Roblox community was in uproar over the unblocking and invitation of "Teddy," a notorious developer, to both "The Hatch" and the Developer Conference. The Hatch was a virtual event, officially sponsored and promoted by Roblox, that enlisted 1,000 Roblox developers to hide virtual eggs in their games so that, across the platform as a whole, users could engage in an elaborate egg hunt. The Hatch was plainly engineered to drive key platform metrics: by creating a new, time-limited goal for players, Roblox hoped to increase daily log-ins, session lengths, and cross-game traffic. It also funneled players—many of them minors—toward participating in developers' games, boosting those developers' visibility and Robux transactions within their game. In other words, The Hatch functioned as a mass "gamified" marketing campaign: Roblox offered prestige and perks to developers willing to participate, while using the resulting event to extract more engagement and spending from its user base.

---

[105] *Roblox Invited a Creep To RDC.. (its bad)*, YouTube (Sep. 7, 2025), https://www.youtube.com/watch?v=tCD9UkNMgl0.

137. "TheOfficialTeddy" was a Roblox account widely known for creating condo games—predatory digital environments, including houses—where users can remove their avatars' virtual clothing, revealing nudity, and engage in disturbing simulated sexual activities with other Roblox users.[106] He also ran a community that had over 100,000 members, a similar reach to Castillo's Warhead Community. In June 2025, Roblox banned Teddy's account after years of his inappropriate games proliferating on the platform and hundreds of millions of visits to those games.

138. Yet, when The Hatch was announced, the Roblox community was shocked to learn that TheOfficialTeddy account not only was active again but had been invited to participate in both The Hatch and the 2025 Developers Conference. The Roblox community was incensed. Prominent YouTubers broke the news to their followers. One major development team even tweeted that it would no longer participate in The Hatch, explaining that they could not "with good conscience support [the] event knowing [Roblox has] invited a bad actor to take part."[107] The development team added, "Bad looks for the platform reflect on us developers as we are supporting it by creating its content."[108]

139. Only after this public outcry did Roblox rescind TheOfficialTeddy's invitation and then admit that it was not appropriate for the developer to have been invited, considering Roblox's *own community standards*, which Roblox clearly did not apply when it decided which developers to invite. And TheOfficialTeddy account was still active for some time afterwards, which caused further distress to the Roblox community.[109]

140. Inviting known predators like "Teddy" and "FlynnsCorner" into both The Hatch and the Developer Conference, *after* Plaintiff's horrific abuse, sends a clear message that, when choosing between safeguarding children and maximizing engagement, Roblox is prepared to

---

[106] EJ Dickson, *Inside the Underground Strip-Club Scene on Kid-Friendly Gaming Site Roblox,* Rolling Stone (Sep. 12, 2021), https://www.rollingstone.com/culture/culture-features/roblox-virtual-strip-clubs-condo-games-sex-1197237/.
[107] @DaRealMiniToon, Twitter (Jun. 17, 2025), https://x.com/DaRealMiniToon/status/1935823322693919040.
[108] *Id.*
[109] *Roblox Supported Teddy*, YouTube (Jun. 20, 2025), https://www.youtube.com/watch?v=a7zCKXXk8cQ.

prioritize the latter. Roblox may have claimed to have made changes to its platform after Plaintiff's suffering, but clearly, its commitment is hollow in wake of its continued support of child predators.

141.    The judge in Castillo's criminal case described Roblox and Discord's duty to their child audiences best, when sentencing Castillo to 15 years, "We protect kids because they can't protect themselves." Roblox and Discord failed to do so, and for that, they must be held accountable.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

### (By Plaintiff Against Roblox and Discord)

142.    Plaintiff incorporates each and every factual allegation set forth above.

143.    This claim is brought against Defendants Roblox and Discord.

144.    At all relevant times, each Defendant possessed superior and exclusive knowledge of material facts concerning the risks their respective platforms posed to children, including but not limited to: (a) the widespread, ongoing use of their platforms by adult predators to identify, access, solicit, groom, and exploit minors; (b) platform design choices and default settings that facilitated unsupervised adult–minor contact, migration to other channels, and re-registration after bans; (c) internal trust-and-safety data reflecting reports, flags, bans, and incident trends evidencing child grooming and sexual exploitation; and (d) specific notice regarding the predator known as "DoctorRofatnik" (real name, Arnold Castillo), including public compilations of his sexualized messages to a 12-year-old and other minors, his video admission confirming those messages' authenticity, media exposés, and platform-level reports from users and parents.

145.    Each Defendant was under a duty to disclose these material facts to Plaintiff, her family, and the public. That duty arose from: (a) each Defendant's exclusive knowledge of material risks not known or reasonably knowable to minors and their parents; (b) partial representations and safety assurances that were misleading absent disclosure of the omitted material facts; (c) the special relationship and dependence each Defendant cultivated with families and child users by designing, marketing, and operating child-facing platforms and undertaking to provide child-safety tools and

safeguards; and (d) the foreseeability that minors and their parents would rely on each Defendant's statements and omissions when deciding to use the platforms.

146.    Despite this duty, each Defendant intentionally concealed and suppressed material facts, including by: (a) publicly touting "proactive" safety filters, round-the-clock moderation, family-friendly environments, curated experiences for under-13 users, and "state-of-the-art" AI systems, while omitting that the platforms' actual design, defaults, and enforcement practices enabled adult–minor contact, off-platform migration, and ban evasion; (b) failing to disclose the scope and frequency of predator activity and grooming incidents known to each Defendant through internal reporting, external complaints, and law-enforcement contacts; (c) failing to warn users and parents about known, specific predators—including Castillo—who were active or reappearing on the platforms and associated developer communities; and (d) continuing to host, promote, or enable monetization and community growth in spaces tied to known predation risks, while suppressing or ignoring material information that would have alerted parents and minors to the danger.

147.    Each Defendant's concealment was deliberate.  Defendants knew that disclosure of the true risk profile, incidence of grooming and exploitation, ineffectiveness of key safety features, and the ongoing presence and re-emergence of known predators would reduce user engagement, developer monetization, key growth metrics, and revenue. Each Defendant acted with the intent to induce continued or increased use of its platform by minors and reliance by parents on the companies' safety assurances and curated features.

148.    The concealed and suppressed facts were material. A reasonable parent or minor user would have considered it important, in deciding whether and how to use each Defendant's platform, that: (a) predators were systematically leveraging the platforms' features to groom and exploit minors; (b) adults could and did pose as children; (c) moderation and safety tooling were repeatedly evaded; (d) default settings and linking prompts facilitated a predictable migration of minors into more private channels; and (e) specific predators, including Castillo, remained able to access or influence child communities associated with Roblox and Discord.

149.    Plaintiff and her family reasonably relied on Defendants' partial representations and omissions. Plaintiff herself was aware of public allegations against "DoctorRofatnik," but was

persuaded by his denial and by the apparent endorsement signaled by his ongoing presence and ability to participate in Roblox and Discord communities, the continued availability and monetization of his associated games and groups, and the lack of any warning or platform-level disclosure from Defendants. This reliance was reasonable given Defendants' positions of authority, self-professed safety expertise, and exclusive access to platform-level risk and enforcement data.

150.   Plaintiff and her family could not have discovered the concealed facts through reasonable diligence. The material information—platform incident data, report volumes, ban evasion patterns, specific enforcement decisions, and investigation into Castillo's behavior—was uniquely within Defendants' possession and not publicly available. Defendants' continued safety messaging and curation further obscured the truth.

151.   Had the concealed facts been disclosed, Plaintiff herself would not have engaged with Castillo or his associated communities. At minimum, earlier and adequate disclosure would have materially reduced Plaintiff's exposure to Castillo and prevented or mitigated the injuries suffered.

152.   As a direct and proximate result of each Defendant's material omissions, misrepresentations, and/or concealment of material information, Plaintiff sustained serious injuries and harm.

153.   Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

154.   Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION

## NEGLIGENCE – GENERAL

## (By Plaintiff Against Roblox and Discord)

155. Plaintiff incorporates each and every factual allegation set forth above.

156. This claim is brought against Defendants Roblox and Discord.

157. At all relevant times, each Defendant developed, set up, managed, maintained, operated, marketed, advertised, promoted, supervised, controlled, and benefited from its respective app used by Plaintiff.

158. Each Defendant owed Plaintiff a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its app and not to create an unreasonable risk of harm from and in the use of its app (including an unreasonable risk of grooming, sexual abuse, and sexual exploitation, and other associated physical or mental injuries); to protect Plaintiff from unreasonable risk of injury from and in the use of its app; and not to invite, encourage, or facilitate youth, such as Plaintiff, to foreseeably engage in dangerous or risky behavior through, on, or as a reasonably foreseeable result of using its app. These duties govern Defendants' own specific actions and are based on direct actions Defendants took in developing their apps and features.

159. In addition, each Defendant owed a special relationship duty to Plaintiff to protect her against harm caused by its app and employees or by other users. This special relationship duty is based on the following:

    a. As businesses, Defendants owe a duty to protect customers against reasonably foreseeable criminal acts of third parties and other dangers known to Defendants on their apps;

    b. Plaintiff, as a minor, was vulnerable and dependent on Defendants for a safe environment on their apps, and Defendants have superior ability and control to provide that safety with respect to activities that they sponsor or control;

    c. Plaintiff relied upon Defendants for protection against third-party misuse or misconduct;

d.  The special relationship Plaintiff had with Defendants substantially benefits Defendants through revenue and growth in users and user activity. Defendants could not successfully operate without the growth in users and user activity generated by children;

e.  Defendants were far more to Plaintiff than a business. Defendants provided Plaintiff with opportunities for social interaction and a discrete community of other users. Plaintiff was dependent on Defendants to provide structure, guidance, and a safe environment;

f.  Defendants have superior control over their app environments and the ability to protect their users. Defendants impose a variety of rules and restrictions to supposedly maintain a safe and orderly environment. Defendants employ internal staff to enforce these rules and restrictions and can monitor and discipline users when necessary. Defendants have the power to influence Plaintiff's values, consciousness, relationships, and behaviors; and

g.  Defendants have voluntarily undertaken a responsibility to keep children safe on their apps. As alleged above, Defendants have publicly stated that they take steps to keep children safe on their apps and therefore have undertaken a duty to act reasonably in taking such steps.

160.  Plaintiff was a foreseeable user of each Defendant's app.

161.  Each Defendant knew that minors such as Plaintiff would use its app.

162.  Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of its app.

163.  Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective app (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as Plaintiff in a reasonably foreseeable manner.

164.  At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective app (as developed, set up, managed, maintained, supervised,

and operated by that Defendant) posed unreasonable risks of harm to youth such as Plaintiff, which risks were known and knowable, including in light of the internal data and knowledge each Defendant had regarding its app.

165. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary child users of its respective app, such as Plaintiff, would not have realized the potential risks and dangers of using the app, including a risk of grooming, sexual abuse, and sexual exploitation, which foreseeably can lead to a cascade of negative effects, including but not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, eating disorders, death, and other harmful effects.

166. Each Defendant's conduct was closely connected to Plaintiff's injuries, which were highly certain to occur, as evidenced by the significance of Plaintiff's injuries.

167. Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including certain features in its respective app which harmed Plaintiff.

168. Imposing a duty on Defendants would benefit the community at large.

169. Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to Plaintiff.

170. Each Defendant owed a heightened duty of care to youth users of its app because children's brains are not fully developed, meaning young people are more neurologically vulnerable than adults to abusive contact facilitated by Defendants' apps because they have a hard time distinguishing between patterns of genuine friendship and grooming relationships.

171. Each Defendant breached its duties of reasonable care through specific notice-driven failures tied to specific reports and complaints, as well as broader enforcement, design, and warning lapses after receiving actual and constructive notice of Castillo's predatory conduct. Roblox's breaches include but are not limited to:

a. Roblox failed to reasonably investigate and act upon credible, corroborated reports from users.  After being provided with the Google document compiling Castillo's sexualized messages to a 12-year-old and other minors, Castillo's own video admission confirming the messages' authenticity, and direct outreach from community members and at least one parent, Roblox did not promptly and comprehensively investigate the reports. First, Roblox refused to respond to the report from an underage user, instead telling the user that a parent report was needed. Second, after the parent created a report, Roblox never contacted the parent to learn more. Third, Roblox attempted to shift the burden of determining that the identity of the Discord user was the same as DoctorRofatnik to a *user* rather than conduct its own investigation based on widely circulated, publicly available media. Fourth, Roblox employees inaccurately claimed that there was nothing Roblox could do to punish users for behavior on other platforms. Fifth, Roblox never conducted any interim containment measures that would have signaled to Roblox users that the allegations were serious, such as suspending Robux payouts and disbursements for *Sonic Eclipse Online* and other Warhead Entertainment games pending the outcome of the investigation, or creating banners for the Warhead group or *Sonic Eclipse Online* games detailing that they were under investigation for exploitative behavior and content. Sixth, Roblox never detailed the findings of its investigations to the users and parents who had reported its account. Moreover, given the public nature of the controversy, Roblox never alerted users in the Warhead Entertainment group or the *Sonic Eclipse Online* game about the findings of its investigation. Seventh, Roblox failed to fully investigate DoctorRofatnik's behavior on its own platform. Eighth, Roblox failed to investigate allegations against other Warhead Entertainment leaders who were also accused of pedophilic behavior, which would have revealed that such pedophilic behaviors were pervasive in *Sonic Eclipse Online* and Warhead Entertainment's group. Ninth, even when given a global, public platform to comment on the results of its investigation, which would have reached

a wide range of users, Roblox refused to confirm that DoctorRofatnik had violated its community standards and that the allegations against him were credible. Tenth, Roblox's investigation failed to identify *Sonic Eclipse Online*'s clear copyright infringement of Sega's intellectual property.

b.  Roblox failed to take reasonable steps to identify Castillo's real-world identity and to act on publicly available signals. Roblox users—many of them minors—were able to connect "DoctorRofatnik" to Arnold Castillo using open-source materials. Roblox, with vastly greater investigative resources and access to internal data, failed to conduct comparable diligence, to act on identity confirmation already provided by users, or to tailor remedial measures based on that knowledge.

c.  Roblox negligently permitted Castillo to continue operating on the platform and profiting from *Sonic Eclipse Online*. After banning one account, Roblox permitted Castillo to transfer ownership of the game to a confederate and to create new accounts—many of which Roblox failed to block—allowing him to remain active under "LastOutlawz." Roblox had repeated public notice that Castillo was continuing to monetize his games on Roblox and yet Roblox continued paying out revenues tied to *Sonic Eclipse Online* and other Warhead projects after notice, and Castillo publicly boasted of receiving a $15,097.35 Roblox payment post-ban. Roblox failed to disable payouts, claw back funds, suspend group disbursements, block IP/MAC/device identifiers tied to Castillo, or otherwise enforce a meaningful platform-level exclusion.

d.  Roblox failed to promptly report the DoctorRofatnik account and its behavior to NCMEC. When Roblox did report to NCMEC, it failed to include important, easily available information about DoctorRofatnik's account, including the billing information that allowed the account to receive DevEx payouts and other known IP addresses associated with the account, which would have easily identified DoctorRofatnik's real identity. The failure to promptly report the DoctorRofatnik

account was also in violation of 18 U.S.C. § 2258A and Roblox's conduct here constitutes negligence *per se*.

172. Discord's breaches include but are not limited to:

a. Discord failed to reasonably investigate and act upon the widely circulated Google document compiling Castillo's sexualized messages to a 12-year-old and others, his video admission confirming authenticity, and media reports flagging his Discord identity and server activity. Despite Discord's clear notice of behavior that violated its own policies, Discord did not conduct any investigation, or failed to conduct an adequate investigation;

b. Discord failed to leverage its superior platform data, including shared servers, mutual contact networks, device and IP clusters and bot logs, to identify Castillo's affiliated accounts and communities; and

c. Discord failed to promptly report Castillo's highly publicized, inappropriate activity on its platform to NCMEC. The failure to promptly report was also in violation of 18 U.S.C. § 2258A and Roblox's conduct here constitutes negligence *per se*.

173. Each Defendant also breached its duties of care owed to Plaintiff through its affirmative malfeasance, actions, business decisions, and policies in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective app. These breaches are based on Defendants' own actions in managing their own apps made available to the public, independent of any actions taken by a third party. Those breaches include but are not limited to:

a. Including features in their apps that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of grooming, sexual abuse, and sexual exploitation to youth, including Plaintiff;

b. Including features in their apps that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to physical injury, damage to self-worth, stigma

and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, eating disorders, death, and other harmful effects;

c.  Maintaining unreasonably dangerous features in their apps after notice that such features, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users;

d.  Facilitating unsupervised and/or hidden use of their respective apps by youth, including by adopting protocols that allow youth users to change their own safety settings or parental controls, and create multiple and private accounts; and

e.  Inviting young children on their apps and marketing to young children when Defendants knew that the apps, as designed, were not safe for young children.

174.  Each Defendant breached its duties of care owed to Plaintiff through its nonfeasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective app. These breaches are based on Defendants' own actions in managing their own apps made available to the public, independent of any actions taken by a third party. Those breaches include but are not limited to:

a.  Failing to implement effective parental controls;

b.  Failing to screen users before allowing them on the apps;

c.  Failing to implement effective parental notifications, such as when a child messages another user, particularly an adult user, or when a child interacts with accounts that have been blocked by other users or suspended in the past;

d.  Failing to require adult users to provide a phone number when signing up for an account;

e.  Failing to implement pop-up safety notices within chats and games to warn users about inappropriate behavior;

f.  Failing to ban IP and MAC addresses of accounts associated with known abusers;

g.  Failing to set default safety settings to the most protective options;

h.  Having an open chat function;

i.  Failing to provide a transcript of a child's communications to the parent;

j.  Failing to implement reasonably available means to monitor for, report, and prevent the use of their apps by sexual predators to victimize, abuse, and exploit youth users;

k.  Failing to provide effective mechanisms for youth users and their parents/guardians to report abuse or misuse of their apps;

l.  Failing to implement effective protocols to verify ages and identity of all users;

m.  Failing to place reasonable age restrictions on the apps;

n.  Failing to enforce effect bans and prevent evasion;

o.  Failing to separate adults from children on the apps by, for example, creating separate apps for children;

p.  Failing to coordinate with other platforms despite knowledge that both platforms were being used in tandem, as a pipeline to groom and exploit children;

q.  Failing to adequately fund their trust and safety programs; and

r.  Others as set forth herein.

175.  A reasonable company under the same or similar circumstances as Defendants would have developed, set up, managed, maintained, supervised, and operated its app in a manner that is safer for and more protective of youth users like Plaintiff.

176.  At all relevant times, Plaintiff used each Defendant's app in the manner in which it was intended to be used.

177.  As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiff was harmed. Such harms include the sexual abuse and exploitation of Plaintiff by a known child predator and a cascade of resulting negative effects, including but not limited to damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior,

susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues such as depression, anxiety, and other harmful effects.

178. Each Defendant's breach of one or more of its duties was a substantial factor in causing harms and injuries to Plaintiff.

179. Plaintiff was injured from using both of Defendants' defective apps through no fault of her own. The fact that Plaintiff was injured by using both of Defendants' apps means that Defendants are each jointly and severally responsible for the injuries caused by any one of Defendants' apps and the burden shifts to Defendants to identify alternative causes of the alleged injuries and apportion responsibility for the alleged injuries.

180. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' apps.

181. Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

182. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO WARN

**(By Plaintiff Against Roblox and Discord)**

183. Plaintiff incorporates each and every factual allegation set forth above.

184. This claim is brought against Defendants Roblox and Discord.

185. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefited from its app used by Plaintiff.

186. Plaintiff was a foreseeable user of each Defendant's app.

187. Each Defendant knew, or by the exercise of reasonable care, should have known, that Castillo's respective accounts on their platforms posed immediate danger to minor users.

188. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minor users, such as Plaintiff, would not have realized the potential risks and dangers that Castillo's accounts posed.

189. Each Defendant knew, or by the exercise of reasonable care, should have known, that use of its app was dangerous, harmful, and injurious when used in a reasonably foreseeable manner by minors.

190. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minor users, such as Plaintiff, would not have realized the potential risks and dangers of its app, including a risk of grooming, sexual abuse, and sexual exploitation, which can lead to a cascade of harms. Those harms include but are not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

191. Had Plaintiff received proper or adequate warnings about the risks of each Defendant's app, or about Castillo's behavior on the apps, Plaintiff would have heeded such warnings.

192. Each Defendant knew or, by the exercise of reasonable care, should have known that Castillo's behavior on its app posed harm to youth. These risks were known and knowable in light of Defendants' own internal data and knowledge regarding Castillo's behavior at the time of development, design, marketing, promotion, advertising, and distribution to Plaintiff.

193. Each Defendant knew or, by the exercise of reasonable care, should have known that its app posed risks of harm to youth. These risks were known and knowable in light of Defendants' own internal data and knowledge regarding their apps at the time of development, design, marketing, promotion, advertising, and distribution to Plaintiff.

194. Because Defendants' conduct created the risk that child users of their apps would be subject to grooming, sexual abuse, and sexual exploitation, Defendants each owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide adequate warnings about the risk of using Defendants' apps and Castillo's behavior that were known to Defendants, or that Defendants should have known through the exercise of reasonable care.

195. In addition, as described above, each Defendant owed a special relationship duty to Plaintiff to protect her against harm caused by its app and employees or by other users.

196. Each Defendant owed a heightened duty of care to minor users and their parents to warn about its app's risks and Castillo's behavior because children's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding contact with strangers online. Children are also more neurologically vulnerable than adults to abusive contact facilitated by Defendants' apps because they have a hard time distinguishing between patterns of genuine friendship and grooming relationships.

197. Each Defendant breached its duty by failing to provide adequate warnings to Plaintiff about its own knowledge of credible allegations against Castillo including, but not limited to:

    a. Failure to issue platform-wide safety advisories after public, credible notice of a known predator. After the circulation of the Google document compiling Castillo's sexualized messages with a 12-year-old, his recorded admission video confirming authenticity, and mainstream media coverage, neither Roblox nor Discord issued in-app banners, email alerts, or safety bulletins warning child users and their parents of the risk posed by Castillo and similarly situated predators.

    b. Failure to deliver targeted warnings to exposed cohorts identifiable from platform data. Despite having precise telemetry to identify impacted users, neither company sent targeted in-product notices to minors who (a) joined or interacted with the Warhead/"Sonic Eclipse Online" communities, (b) friended, messaged, or received messages from "DoctorRofatnik," or affiliated accounts, or (c) were present in servers/channels where the grooming occurred.

c.  Failure to notify parents/guardians of at-risk minors. For under-13 and under-18 accounts associated with the above cohorts, neither company sent parent/guardian alerts advising of known grooming risks, off-platform migration, or contact with flagged accounts, despite having contact fields, parental control features, and other notice pathways.

d.  Failure to place interstitials, age-gates, or safety labels at points of risk. Roblox did not place a safety interstitial or warning label on the Sonic Eclipse Online game page, Warhead group page, or developer profile pages, nor did it flag or remove on-page Discord links associated with the known grooming hub. Discord did not label or quarantine the Warhead/Sonic Eclipse server or relevant channels with "safety advisory" banners or age-gates.

e.  Failure to warn users at the moment of cross-platform migration. Knowing Roblox experiences and profiles linked minors into Discord servers used for grooming, neither Roblox nor Discord presented in-flow warnings advising that off-platform contact increases risk, that the destination community was under safety investigation, or that minors should avoid direct messages with unverified adults.

f.  Failure to warn that ban evasion and continuing access did not signal platform endorsement. After Roblox banned one account, neither company warned users that Castillo could and did reappear under alternate accounts, and that methods for blocking a person's access to the platform were not fool proof.

g.  Failure to warn about known high-risk design pathways. Neither platform warned minors or parents that product defaults—such as Roblox-to-Discord linking, open group joins and ease of off-platform contact—create predictable grooming pipelines that increase exposure to adult predators.

h.  Failure to warn about the persistence of revenue and credibility signals. Roblox did not warn that, despite taking negative actions against his account, Castillo's games/groups could continue to generate revenue and platform visibility—but that

such signals should not be interpreted as endorsements about the credibility or safety of an account.

i.  Failure to warn about adult–minor proximity in developer communities. Neither platform cautioned that developer-led communities (including those recruiting minors for unpaid/low-paid roles) presented elevated adult–minor contact risks, despite notice that Castillo recruited, socialized with, and groomed minors within those spaces.

j.  Failure to warn during account creation and onboarding for minors. Neither platform provided clear, prominent, age-tailored warnings to new child users and their parents about grooming risks, adult impersonation, off-platform migration dangers, and steps to avoid adult contact, despite marketing to and designing for child users.

k.  Failure to warn about age-verification gaps enabling adult impersonation. Neither platform warned minors or parents that adults could pose as children due to weak or absent age/identity verification, increasing the likelihood of deceptive contact and grooming.

l.  Failure to warn reporters and communities about outcomes and ongoing risk. Despite repeated safety reports, neither platform communicated back safety outcomes or ongoing risk status to the reporting communities (including Ben Simon and others), thereby depriving affected users and parents of information necessary to take self-protective measures.

m.  Failure to warn after consequential events that confirmed control and risk. Following Roblox's removal of *Sonic Eclipse Online* for IP infringement and The Guardian's exposé consolidating public notice, neither platform issued follow-on advisories clarifying remaining risks, off-platform hazards, or recommended protective steps for affected minors and families.

n.  Failure to warn about the risk of gifts, financial inducements, and logistics support. Neither platform warned minors and parents that predators commonly use digital

gifts, delivery services, or ride-sharing arrangements as grooming and travel logistics—despite evidence of such tactics here.

198.    Each Defendant breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiff, such as failing to notify parents and the general public of the following, among others:

a.  Adult predators use Defendants' apps to target children for sexual exploitation, sextortion, and sex abuse;

b.  Defendants' apps enable and increase risk of exposure to predators and can result in grooming, sexual abuse, and sexual exploitation, as well as their resultant physical and mental injuries;

c.  The reliance on child labor on Roblox to create games enables extortion and grooming because developer/worker dynamics gives abuser-developers leverage over minors;

d.  Defendants fail to block the IP and MAC addresses of known abusers;

e.  Ban-evasion and continuity of access. Users removed for safety reasons can reappear via new accounts and group/asset transfers; visible games/groups can continue under new "owners," so a developer's removal does not imply that associated communities or successors are safe and that minors should disengage from spaces tied to reported individuals;

f.  Usage of Defendants' apps can increase risky and uninhibited behavior in children, making them easier targets to adult predators for grooming, sexual exploitation and sexual abuse;

g.  Usage of Defendants' apps can normalize abuse and pornography, leading children to think that such behaviors are acceptable;

h.  The likelihood and severity of harm is greater for children;

i.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each app's features with one another; and

j.  Others as set forth herein.

199.     A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

200.     At all relevant times, each Defendant could have provided adequate warnings to prevent the harms and injuries described herein.

201.     As a direct and proximate result of each Defendant's breach of its duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing the harms to Plaintiff.

202.     As a direct and proximate result of each Defendant's failure to warn, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

203.     Plaintiff was injured from using both of Defendants' defective apps through no fault of her own. The fact that Plaintiff was injured by using both of Defendants' apps means that Defendants are each jointly and severally responsible for the injuries caused by any one of Defendants' apps and the burden shifts to Defendants to identify alternative causes of the alleged injuries and apportion responsibility for the alleged injuries.

204.     The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' apps.

205.     The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

206.     Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE – UNREASONABLE DESIGN

### (By Plaintiff Against Roblox and Discord)

207. Plaintiff incorporates each and every factual allegation set forth above.

208. This claim is brought against Defendants Roblox and Discord.

209. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefited from its respective app used by Plaintiff.

210. Each Defendant knew or, by the exercise of reasonable care, should have known, that its app was dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner.

211. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective app posed risks of harm to youth. These risks were known and knowable in light of Defendants' own internal data and knowledge regarding their apps at the time of the apps' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

212. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minor consumers such as Plaintiff would not have realized the potential risks and dangers of its app. Those risks include grooming, sexual abuse, and sexual exploitation, which can lead to a cascade of negative effects, including but not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

213. Each Defendant owed a duty to all reasonably foreseeable users to design a safe app.

214. Each Defendant owed a heightened duty of care to minor users of its app because children's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding contact with strangers online. Children are also more neurologically vulnerable

than adults to abusive contact facilitated by Defendants' apps because they have a hard time distinguishing between patterns of genuine friendship and grooming relationships.

215. Plaintiff was a foreseeable user of each Defendant's app.

216. Each Defendant knew that minors such as Plaintiff would use its app.

217. Each Defendant breached its respective duty in designing its app.

218. Each Defendant breached its respective duty by failing to use reasonable care in the design of its app by negligently designing the app with features that specifically allow predators to find, groom, exploit, and abuse children, as described herein.

219. Each Defendant breached its respective duty by designing an app that was less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

220. Each Defendant breached its respective duty by failing to use reasonable care in the design of its app by negligently designing its app with features as described above that created or increased the risk of grooming, sexual abuse, and sexual exploitation for children, which can lead to a cascade of negative effects, including but not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

221. Each Defendant breached its respective duty by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including changes to the harmful features, and other safety measures, to minimize the harms described herein, including but not limited to:

    a. Requiring children have parental approval and a parent's email address to sign-up for an account;

    b. Effective parental controls, such as mandatory parent/guardian portals;

    c. Effective parental notifications, including notifying parents any time a child messages another user, particularly an adult user, or notifying parents when

children interact with accounts that have been blocked by other users or suspended in the past, among other controls;

d.  Setting default safety settings to the most protective options, including blocking direct messaging between child and adult users, or only allowing messaging between adult users and a child with the parent's explicit permission to message the adult user;

e.  Requiring adults to provide a phone number when signing up for an account;

f.  Banning IP and MAC addresses of accounts associated with known abusers, and taking all other reasonable measures to ensure that a banned user does not reappear on the app;

g.  Controlled chat option;

h.  Providing a transcript of a child's communications to the parent;

i.  Implementing reporting protocols to allow users or visitors of Defendants' apps to report CSAM and adult predator accounts specifically without the need to create or log in to the apps prior to reporting;

j.  Robust age and identity verification, including visibly identifying verified adults;

k.  Reasonable age restrictions;

l.  Separating adults from children by, for example, creating separate apps for children;

m.  Disallowing any cross-platform linking;

n.  Automatic suspension of payments to games/servers under safety investigation and escrow funds with clear clawback policies if violations are substantiated;

o.  Ensuring that banned accounts cannot still profit off the apps;

p.  Eligibility thresholds for creator monetization such as conditioning monetization on verified identity, clean safety history, and completion of child-safety training or removing monetization upon substantiated grooming risk;

q. Group ownership and game transfer controls such as disallowing asset/group transfers involving accounts flagged for grooming risk or requiring safety review and cooling-off periods between transfers complete; and

r. Others as set forth herein.

222. Alternative designs that would reduce the dangerous features of Defendants' respective apps were available, would have served effectively the same purpose as Defendants' defectively designed apps, and would have reduced the gravity and severity of danger each Defendant's app posed minor Plaintiffs.

223. A reasonable company under the same or similar circumstances as each Defendant would have designed a safer app.

224. At all relevant times, Plaintiff used each Defendant's app in the manner in which it was intended by each Defendant to be used.

225. As a direct and proximate result of each Defendant's breached duties, Plaintiff was harmed. Each Defendant's design of its respective app was a substantial factor in causing Plaintiff's harms and injuries.

226. Plaintiff was injured from using both of Defendants' defective apps through no fault of her own. The fact that Plaintiff was injured by using both of Defendants' apps means that Defendants are each jointly and severally responsible for the injuries caused by any one of Defendants' apps and the burden shifts to Defendants to identify alternative causes of the alleged injuries and apportion responsibility for the alleged injuries.

227. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using each Defendant's app.

228. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

229.    Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT UNDERTAKING**

**(By Plaintiff Against Roblox)**

230.    Plaintiff incorporates each and every factual allegation set forth above.

231.    This claim is brought against Defendant Roblox.

232.    Roblox voluntarily undertook to investigate reports and complaints regarding the adult developer known as "DoctorRofatnik" (real name, Arnold Castillo), including allegations, which were widely disseminated to Roblox and within its developer community, of sexualized communications with minors and grooming behavior tied to Roblox-associated games, groups, and off-platform collaboration spaces.  Roblox also voluntarily undertook to evaluate and address the safety risks posed by Castillo's games, developer group, and associated links (including official Roblox-sanctioned links to his Discord server) after receiving direct notice from users and at least one parent, public reporting compiling the communications at issue, Castillo's own public admission authenticating those communications, and a mainstream media exposé. Roblox acknowledged receipt of these reports, engaged with reporters of the misconduct, banned at least one account associated with Castillo, and represented that it had evaluated whether Castillo's games and groups posed safety risks. By doing so, Roblox undertook to render services that it should have recognized were necessary for the protection of minors like Plaintiff.

233.    Having assumed that undertaking, Roblox owed a duty to exercise reasonable care in performing the investigation and in implementing protective measures reasonably necessary to reduce the risk of harm to child users arising from the matters under investigation. Roblox breached that duty by negligently performing the undertaking in at least the following ways:

    a.    Roblox unreasonably narrowed the scope and depth of its investigation despite abundant, corroborated evidence of risk. Rather than promptly and comprehensively reviewing reports, chat logs, group ownership and access controls, enforcement

histories, monetization records, and device/network signals associated with Castillo and his developer group, Roblox shifted the burden of investigation and confirming Castillo's identity to community members, resisted acting on off-platform evidence even when authenticated by Castillo himself, and failed to pursue readily available open-source and internal data to confirm identity and risk.

b.  Roblox failed to implement interim containment and safety measures during and after its investigation. It did not suspend Robux payouts and disbursements associated with Castillo's projects pending the outcome of the investigation, and did not notify affected users and guardians of the ongoing safety investigation or warn them about the risks tied to Castillo and his communities.

c.  Roblox failed to reasonably enforce account and access restrictions commensurate with the risks its investigation revealed.  After banning one account, Roblox allowed Castillo to transfer ownership and control to associates, to re-register new accounts, and to continue to participate in and benefit from Roblox's ecosystem, including through continued monetization and group management.  Roblox failed to apply device/IP/billing-instrument-based controls to prevent ban evasion and failed to claw back or hold payouts while safety concerns remained unresolved.

d.  Roblox failed to coordinate or escalate with counterpart platforms or relevant stakeholders as part of the undertaking. Despite actual notice that Castillo used an officially linked Discord server for the conduct at issue, Roblox declined to remove the link, deferred action on the ground that it could be re-added, and failed to take reasonable steps to work with Discord to mitigate ongoing risk.

e.  Roblox also failed to timely and adequately report apparent child-exploitation activity tied to Castillo's Roblox accounts and developer group to the National Center for Missing and Exploited Children ("NCMEC") consistent with its undertaking to investigate and protect minors. Any report(s) Roblox did submit omitted readily available identifiers and routing data necessary for effective law-enforcement action, including the billing and payout information (e.g., DevEx

enrollment and payment instruments) that enabled the "DoctorRofatnik" account and successor accounts to accept and withdraw earnings, as well as associated IP/device clusters and group ownership/access logs. These omissions materially impeded identification and disruption of Castillo and his linked accounts and communities.

234. Roblox's negligent performance of its undertaking increased the risk of harm to Plaintiff. By publicly and operationally signaling that it had investigated, banning only a single account while allowing linked games, groups, links, monetization, and re-registration to persist, Roblox conveyed to minors and parents that the spaces remained safe and that Castillo's presence did not present an actionable safety threat. Roblox's failures preserved and amplified Castillo's access to minors, sustained the growth and legitimacy of his communities, and facilitated his continued grooming and contact with Plaintiff.

235. Plaintiff relied on Roblox's undertaking and performance. Plaintiff was aware of public allegations concerning "DoctorRofatnik" yet was persuaded by his denials and by Roblox's continued platforming of his associated games, groups, and links, the absence of platform-level warnings, and the visible ability of the same developer ecosystem to continue operating after Roblox's investigation and enforcement actions, as well as Roblox's silence on the results of its investigation. That reliance was reasonable given Roblox's superior knowledge, its express safety assurances, and its assumption of investigative and enforcement functions communicated to users.

236. As a direct and proximate result of Roblox's negligent undertaking, Plaintiff suffered the harms described herein. Roblox's negligent performance was a substantial factor in allowing Castillo to remain active in and around Roblox's developer and player communities, to retain credibility and access after the investigation, to continue contact and grooming of Plaintiff, and to consummate the offenses that followed. Roblox's deficient, incomplete investigation into DoctorRofatnik's true identity and inadequate NCMEC reporting—including omission of readily available billing and payout information tied to DevEx, and related IP/device and account-linkage data—prevented Castillo from being identified by law enforcement before he could groom, exploit and abuse Plaintiff. Roblox's deficient NCMEC reporting also delayed and diminished

law-enforcement's ability to identify, locate, and disrupt Castillo, prolonging Plaintiff's exposure and increasing the risk and severity of her injuries.

237. The conduct of Defendant Roblox, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages.

238. Plaintiff demands judgment against Defendant Roblox for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

## (By Plaintiff Against Roblox and Discord)

239. Plaintiff incorporates each and every factual allegation set forth above.

240. This claim is brought against Defendants Roblox and Discord.

241. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

242. Each Defendant's product was designed and intended to be a gaming and/or communication product. The software and architecture of each product is the same for every user that logs on or signs up for an account. These products are uniformly defective and pose the same danger to each minor user.

243. Each Defendant's product is distributed and sold to the public through retail channels (*e.g.*, the Apple App "Store" and the Google Play "Store").

244. Each Defendant's product is marketed and advertised to the public for the personal use of the end-user/consumer.

245. Each Defendant defectively designed its product to allow children to come into contact with child predators. Children are particularly unable to appreciate the risks posed by the products.

246. The defects in the design of each Defendant's product existed prior to the release of these products to Plaintiff and the public, and there was no substantial change to Defendants' products between the time of their upload by each Defendant to public or retail channels (*e.g.*, the App Store or Google Play) and the time of their distribution to Plaintiff via download or URL access.

247. Plaintiff used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection for its dangerous nature.

248. Each Defendant defectively designed its product to appeal to adult predators by making it easy to find children and enabled their contact, grooming, sexual exploitation, and sexual abuse of children, including Plaintiff.

249. Each Defendant failed to test the safety of the features it developed and implemented for use on its product. When each Defendant did perform some product testing and had knowledge of ongoing harm, it failed to adequately remedy its product's defects or warn Plaintiff.

250. Each Defendant's product is defective in design and poses a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner. Children and teenagers are among the ordinary consumers of Defendants' products. Indeed, each Defendant markets, promotes, and advertises its respective product to pre-teen and young consumers. Pre-teen and young consumers, and their parents and guardians, do not expect Defendants' products to expose them to predators when the products are used in their intended manner by their intended audience. They do not expect the features embedded by Defendants in their products to make it easy for child predators to sign-up for accounts and find children, groom

children, and sexually exploit children. They do not expect Defendants' revenue and profits to be directly tied to predators' extortion of children.

251. Each Defendant's product is likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of grooming, sexual abuse, and sexual exploitation, which can lead to a cascade of harms. Those harms include but are not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

252. The risks inherent in the design of each Defendant's product significantly outweigh any benefits of such design.

253. Defendants could have utilized cost-effective, reasonably feasible alternative designs, including changes to the problematic features described above, to minimize the harms described herein, including, but not limited to:

      a.   Requiring children have parental approval and a parent's email address to sign-up for an account;

      b.   Effective parental controls, such as mandatory parent/guardian portals;

      c.   Effective parental notifications, including notifying parents any time a child messages another user, particularly an adult user, or notifying parents when children interact with accounts that have been blocked by other users or suspended in the past, among other controls;

      d.   Setting default safety settings to the most protective options, including blocking direct messaging between child and adult users, or only allowing messaging between adult users and a child with the parent's explicit permission to message the adult user;

      e.   Requiring adults to provide a phone number when signing up for an account;

f.  Banning IP and MAC addresses of accounts associated with known abusers, and taking all other reasonable measures to ensure that a banned user does not reappear on the app;

g.  Controlled chat option;

h.  Providing a transcript of a child's communications to the parent;

i.  Implementing reporting protocols to allow users or visitors of Defendants' apps to report CSAM and adult predator accounts specifically without the need to create or log in to the apps prior to reporting;

j.  Robust age and identity verification, including visibly identifying verified adults;

k.  Reasonable age restrictions;

l.  Separating adults from children by, for example, creating separate apps for children;

m.  Disallowing any cross-platform linking;

n.  Automatic suspension of payments to games/servers under safety investigation and escrow funds with clear clawback policies if violations are substantiated;

o.  Ensuring that banned accounts cannot still profit off the apps;

p.  Eligibility thresholds for creator monetization such as conditioning monetization on verified identity, clean safety history, and completion of child-safety training or removing monetization upon substantiated grooming risk;

q.  Group ownership and game transfer controls such as disallowing asset/group transfers involving accounts flagged for grooming risk or requiring safety review and cooling-off periods between transfers complete; and

r.  Others as set forth herein.

254.  Alternative designs were available that would prevent child predators from finding, grooming, and exploiting children, and which would have served effectively the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

255. Plaintiff used Defendants' respective products as intended or in reasonably foreseeable ways.

256. The physical, emotional, and economic injuries of Plaintiff were reasonably foreseeable to Defendants at the time of their products' development, design, advertising, marketing, promotion, and distribution.

257. Each Defendant's product was defective and unreasonably dangerous when it left each Defendant's respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

258. As manufacturers, designers and seller, each Defendant had a duty to inform themselves with the best knowledge of the risks and the defects of its product and each Defendant had such knowledge. Their victims, including Plaintiff, were powerless to protect themselves against unknown harms, and Defendants should bear the costs of their injuries.

259. Plaintiff was injured as a direct and proximate result of each Defendant's respective defective designs as described herein. The defective design of the products used by Plaintiff was a substantial factor in causing harms to Plaintiff.

260. As a direct and proximate result of each Defendant's respective product's defective design, Plaintiff suffered serious and dangerous injuries.

261. As a direct and proximate result of each Defendant's product's defective design, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

262. Plaintiff was injured from using both of Defendants' defective products through no fault of her own. The fact that Plaintiff was injured by using both of Defendants' products means that Defendants are each jointly and severally responsible for the injuries caused by any one of Defendants' products and the burden shifts to Defendants to identify alternative causes of the alleged injuries and apportion responsibility for the alleged injuries.

263. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products.

264. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

265. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper

### SEVENTH CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

### (By Plaintiff Against Roblox and Discord)

266. Plaintiff incorporates each and every factual allegation set forth above.

267. This claim is brought against Defendants Roblox and Discord.

268. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

269. Each Defendant's product was designed and intended to be a gaming and/or communication product. The software and architecture of each product is the same for every user that logs on or signs up for an account. These products are uniformly defective and pose the same danger to each minor user.

270. Each Defendant's product is distributed and sold to the public through retail channels (*e.g.*, the Apple App "Store" and the Google Play "Store").

271. Each Defendant sold and distributed its respective product to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth

as described herein, including a risk of grooming, sexual abuse, and sexual exploitation, which can lead to a cascade of harms. Those harms include but are not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

272.    Defendants were in the best position to know the dangers their products posed to consumers, including Plaintiff, as they had superior knowledge of the risks and dangers posed by their products and had exclusive knowledge of these risks at the time of development, design, marketing, promotion, advertising and distribution. Defendants had exclusive control of their products at all times relevant to this litigation.

273.    Each Defendant's respective product is dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they enable predators to find, groom, abuse, and exploit children.

274.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective product posed risks of harm to youth considering its own internal data and knowledge regarding its product at the time of development, design, marketing, promotion, advertising, and distribution.

275.    These risks were known and knowable in light of Defendants' own internal data and knowledge regarding their products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

276.    Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

        a.    Adult predators use Defendants' apps to target children for sexual exploitation, sextortion, and sex abuse;

b. Defendants' apps enable and increase risk of exposure to predators and can result in grooming, sexual abuse, and sexual exploitation, as well as their resultant physical and mental injuries;

c. The reliance on child labor on Roblox to create games enables extortion and grooming because developer/worker dynamics gives abuser-developers leverage over minors;

d. Defendants fail to block the IP and MAC addresses of known abusers;

e. Ban-evasion and continuity of access. Users removed for safety reasons can reappear via new accounts and group/asset transfers; visible games/groups can continue under new "owners," so a developer's removal does not imply that associated communities or successors are safe and that minors should disengage from spaces tied to reported individuals;

f. Usage of Defendants' apps can increase risky and uninhibited behavior in children, making them easier targets to adult predators for grooming, sexual exploitation and sexual abuse;

g. Usage of Defendants' apps can normalize abuse and pornography, leading children to think that such behaviors are acceptable;

h. The likelihood and severity of harm is greater for children;

i. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each app's features with one another; and

j. Others as set forth herein.

277. Plaintiff was a foreseeable user of each Defendant's product.

278. Ordinary minor users would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to Defendants.

279. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using each Defendant's product, Plaintiff would have heeded the warnings and/or followed the instructions.

280. Each Defendant's failures to adequately warn Plaintiff about the risks of their defective products were a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

281. Plaintiff was injured from using both of Defendants' defective products through no fault of her own. The fact that Plaintiff was injured by using both of Defendants' products means that Defendants are each jointly and severally responsible for the injuries caused by any one of Defendants' products and the burden shifts to Defendants to identify alternative causes of the alleged injuries and apportion responsibility for the alleged injuries.

282. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products.

283. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

284. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION

### 18 U.S.C. § 1595 Civil Remedy for § 1591 Violation (Sex Trafficking of Minors)

### (By Plaintiff Against Roblox and Discord)

285. Plaintiff incorporates each and every factual allegation set forth above.

286. This claim is brought against Defendants Roblox and Discord.

287. 18 U.S.C. § 1591 criminalizes beneficial participation in a venture which has engaged in sex trafficking.

288. When the victim is a minor, sex trafficking occurs when the minor "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a).

289. A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(3).

290. An individual who is a victim of a violation of 18 U.S.C. § 1591 may bring a civil action under 18 U.S.C. § 1595 against whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of 18 U.S.C. § 1591.

291. Defendants and Castillo formed a venture as defined by 18 U.S.C. § 1591 because they constituted a "group of two or more individuals associated in fact, whether or not a legal entity" via Castillo's games and community on Roblox and channels on Discord.

292. Defendants knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595.

293. Defendants' conduct was in, or affected, interstate commerce.

294. The venture was formed no later than July 2012, when Castillo created his "DoctorRofatnik" Roblox account and began developing and operating games and communities on Roblox, and later companion servers and channels on Discord. From that point forward, Castillo used both platforms, jointly and in tandem, to attract, recruit, and retain large minor audiences, to move minors into servers on Discord, and to cultivate status and leverage over minors through developer, moderator, and "work" roles and the promise or provision of Robux-linked value.

295. Roblox and Discord had constructive knowledge—long before the trafficking of Plaintiff—that their platforms were widely used for grooming and child sexual exploitation that violates § 1591. That knowledge arose from, among other sources, large volumes of user and parent reports; repeated law-enforcement investigations and contacts; public incident reporting; and extensive media coverage documenting adult predators' systematic use of Roblox and Discord to identify, access, groom, and exploit minors.

296. Roblox and Discord had actual knowledge that the venture with Castillo engaged in violations of § 1591. Beginning months before the trafficking of Plaintiff, Defendants had repeated, detailed, acknowledged, and widely publicized notice that Castillo used Roblox and Discord to groom minors, including, but not limited to: (a) the public Google documents compiling Castillo's

sexually explicit messages to a 12-year-old and other minors; (b) Castillo's own video admission acknowledging the authenticity of those messages; (c) user and parent reports to Roblox, which Roblox acknowledged receiving; (d) outreach by influential community members to Roblox employees, which at least one Roblox employee acknowledged receiving; (e) the removal of one of Castillo's accounts while his games and monetization continued; (f) the announcement from Castillo's game development group, Warhead Entertainment, that it would continue to develop games for Roblox; (g) Castillo's public boasting of continued Roblox payments; (h) the prominent newspaper exposé detailing Castillo's grooming of and sexually explicit messages to minors using both Roblox and Discord; and (i) Roblox's and Discord's knowledge of, and support for, cross-platform collaboration and communication between Roblox developers and users on Discord.

297.    With actual knowledge of the venture, Roblox and Discord knowingly assisted, supported, and facilitated the venture's sex trafficking activities in multiple ways, including but not limited to:

    a.  Continuing to provide the core tools, infrastructure, distribution, and monetization pathways that enabled Castillo's access to children, including hosting and promoting his games and groups on Roblox and Discord; and

    b.  Continuing payouts or enabling the flow of value to Castillo and his confederates tied to Roblox activities after notice of Castillo's inappropriate behavior towards minors, thereby providing funds that facilitated grooming, gifts, and transportation associated with the trafficking of Plaintiff. Even after the DoctorRofatnik account was banned, Roblox knew that any payments for *Sonic Eclipse Online* or Warhead Entertainment still benefited Castillo because he said as much online. Indeed, Castillo's own criminal defense counsel said that the funds he earned from Roblox paid for the crimes he committed. In the face of publicly available statements from Castillo that he was still profiting from *Sonic Eclipse Online* and the blatant intellectual property violations, the only reasonable explanation for Roblox's failure to delete the experience and

stop bankrolling Castillo's grooming activities is Roblox's own share of the profits.

298. Roblox and Discord knowingly benefited, financially or by receiving things of value, from their participation in the venture. Roblox derived revenue and other value directly tied to Castillo's activity on the platform, including but not limited to Robux transactions within *Sonic Eclipse Online* and other Warhead Entertainment games. Roblox also benefited from the amplification of Roblox's daily active users, session length, and related monetization.

299. Discord likewise derived revenue and other value from Castillo's activity on Discord, including but not limited to increased user registrations, server growth and engagement, and the expansion of Discord's user base and usage metrics that support subscription sales and other monetization. Additionally, Discord directly profited from Castillo's activities via Castillo's purchase of "server boosts" for the *Sonic Eclipse Online* Discord server, which are paid subscriptions that enhance a Discord server's features and from which Discord derives revenue.

300. Defendants also knowingly benefitted more broadly from the grooming and exploitation of minors on their platforms by permitting and profiting from product designs and policies that predictably increase minors' exposure to adult predators and reward engagement, migration, and monetization linked to developer communities with large minor audiences.

301. The venture engaged in sex trafficking of a minor in violation of 18 U.S.C. § 1591. Castillo used Roblox and Discord to recruit, entice, solicit, and groom Plaintiff, a minor, and to facilitate her transportation and harboring for the purpose of commercial sex acts, including actual and attempted coercion and enticement. Castillo ultimately transported Plaintiff across state lines, sexually assaulted her, and was convicted of federal offenses arising from that conduct. The trafficking acts were enabled and furthered by Defendants' products, policies, and practices as alleged herein.

302. The trafficking involved commercial sex acts because things of value were given and received on account of the sex acts, including gifts, paid deliveries, items and equipment of value, and transportation payments connected to Castillo's exploitation and transport of Plaintiff.

303. Even before Plaintiff's abuse, Defendants knew that minors who Castillo had groomed and engaged in explicit conversations with had received things of value from him, including payments and Robux. Defendants also knew or should have known that minors were participating in Castillo's Discord server where those who Castillo favored found increased social standing amongst the developer's friends and follows.

304. As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered serious and dangerous injuries.

305. As a direct and proximate result of each Defendant's unlawful conduct as alleged hereinabove, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

306. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

307. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper and under 18 U.S.C. § 1595(a).

## NINTH CAUSE OF ACTION

## NEGLIGENCE - GENERAL

### (By Plaintiff Against Uber)

308. Plaintiff incorporates each and every factual allegation set forth above.

309. This claim is brought against Defendant Uber.

310. At all relevant times, Uber owned, operated, designed, maintained, managed, marketed, and controlled the Uber platform, including its driver-rider matching, in-app communications, and trip/payment systems. Uber held itself out as a safe, technology-enabled transportation network and exercised substantial control over who may drive on the platform, how

rides are requested and accepted, how drivers and riders may communicate, and what conduct is permitted.  Plaintiff was a foreseeable member of the class of persons whom Uber's safety policies and systems were designed to protect.

311.    Uber owed Plaintiff a duty to exercise reasonable care in the design and operation of its platform to protect foreseeable victims—including minors and their families—from unreasonable risks of harm arising from Uber-enabled driver conduct, including foreseeable criminal acts facilitated by the platform's communications and transaction features. That duty arises from, among other things: (a) Uber's business-premises and special-relationship duties to protect customers and foreseeable third parties from reasonably foreseeable criminal acts of its drivers; and (B) Uber's superior knowledge, control, and ability to implement safeguards governing in-app messaging, contact exchange, and trip/payment flows.

312.    Uber breached its duty by negligently designing, operating, and supervising its driver communications and transaction systems in ways that enabled and encouraged drivers to solicit, arrange, and consummate off-platform transportation of vulnerable riders, including minors, beyond Uber's safety controls and oversight. Uber's breaches include, without limitation:

    a.  Uber allowed and facilitated drivers and riders to exchange off-platform contact and payment information through the app's communications features, including phone numbers, usernames, and references to third-party cash transfer services (e.g., Cash App), without adequate detection or intervention, despite well-known safety risks that off-platform migration removes trip telemetry, identity assurance, insurance coverage, GPS tracking, and safety incident reporting, and thus is likely to involve illicit activities.

    b.  Uber failed to implement and enforce reasonable technical and policy guardrails that would have prevented or deterred drivers from accepting or arranging "cash trips" and other off-app rides for minors, including by: (a) warning drivers that off-platform rides involving minors carry high risks that the minor is being transported for sex trafficking purposes, and threatening drivers and riders with consequences should they engage in such rides; (b) escalating messages

internally that appear to solicit off-platform rides and creating real-time prompts, suspensions, or deactivations for both riders and drivers that attempt to do so; and (c) reporting to law enforcement both riders and drivers who attempt to arrange long haul transportation of minors on its app.

c. Uber failed to detect and act on clear red flags of off-platform solicitation and interstate transport of an unaccompanied minor in the communications leading up to Plaintiff's abduction, including references to large cash or Cash App payments, long-distance pickup and drop-off arrangements spanning multiple states, and coordination details inconsistent with a lawful in-app trip. Reasonable systems would have flagged and escalated Castillo's solicitation to the driver, and warned the driver not to accept such requests.

d. Uber failed to adopt and enforce effective policies banning drivers from arranging or performing off-platform rides with minors, including conducting routine audits of in-app messaging, enforcing zero-tolerance consequences for solicitation of off-app trips, and delivering driver education and in-app warnings that such conduct is prohibited and dangerous.

313. Uber's driver onboarding, supervision, and enforcement practices were inadequate to deter, detect, and discipline drivers who accept off-platform rides, involving minors.

314. Uber's negligent design and operation of its in-app communications and enforcement allowed the driver who transported Plaintiff to move the conversation off-platform, arrange an interstate abduction for cash/Cash App payments, and complete the trip without Uber's safety systems—GPS tracking, on-trip monitoring, insurance, and emergency tools. Had Uber exercised reasonable care—by blocking off-platform solicitations; interdicting Cash App/cash arrangements; flagging and stopping the proposed cross-state "side job;" enforcing a prohibition on transporting unaccompanied minors; suspending the driver; and alerting Trust & Safety and law enforcement—the off-platform transport would have been prevented and Plaintiff would not have been abducted and abused.

315.    Plaintiff's injuries were the foreseeable result of Uber's failures. The risk that riders would use Uber's app to solicit off-platform rides, particularly involving unaccompanied minors and long-distance transport, is well known and preventable through reasonable platform design, monitoring, policy enforcement, and warnings. Uber possessed the technical and operational means to implement these safeguards at modest cost relative to the gravity of harm.

316.    As a direct and proximate result of Uber's negligence, Plaintiff suffered severe physical, psychological, and emotional injuries, and incurred medical and related expenses, in amounts to be proven at trial.

317.    The conduct of Uber, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Uber and deter others from like conduct.

318.    Plaintiff demands judgment against Uber for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment against Defendants for the above-referenced claims and causes of action, and as follows:

1.    Past, present, and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial, to compensate Plaintiff for injuries sustained as a result of the use of each Defendant's product, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, and expenses for medical treatments;

2.    Past, present, and future economic and special damages, according to proof at the time of trial;

3.    Impaired earning capacity according to proof at the time of trial;

4.    Medical expenses, past and future, according to proof at the time of trial;

5.  Punitive or exemplary damages according to proof at the time of trial;

6.  Attorneys' fees;

7.  For costs of suit incurred herein;

8.  Pre-judgment and post-judgment interest as provided by law; and

9.  For such other and further relief as the Court may deem just and proper.

## VII.  DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Date:  April 24, 2026

Respectfully submitted,

**ANDREWS & HIGGINS**

By: */s/ Robert Siko*
ROBERT SIKO (SBN 312856)
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Telephone: (949) 748-1000
Facsimile: (949) 315-3540
rsiko@andrewshiggins.com

**ANAPOL WEISS**

ALEXANDRA M. WALSH*
14 Ridge Square, NW, 3rd Floor
Washington, DC 20016
Telephone: (771) 224-8065
Facsimile: (215) 735-2211
awalsh@anapolweiss.com

PAIGE BOLDT (SBN 308772)
D. PATRICK HUYETT*
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 608-9645
Facsimile: (215) 735-2211
pboldt@anapolweiss.com
phuyett@anapolweiss.com

*\*Pro Hac Vice* motions forthcoming